484 So.2d 1277 (1986)
Gloria WASKIN, Appellant,
v.
Robert R. WASKIN, Appellee.
No. 85-1606.
District Court of Appeal of Florida, Third District.
February 18, 1986.
Rehearing Denied April 2, 1986.
Bernard B. Weksler, Coral Gables, for appellant.
Norman S. Klein and Alan D. Sackrin and Linda A. Fenner, North Miami Beach, for appellee.
Before HENDRY, NESBITT and DANIEL S. PEARSON, JJ.
DANIEL S. PEARSON, Judge.
If, as the cases tell us, the clean hands doctrine prevents a court of equity from relieving a former husband of his obligation to pay alimony to his former wife where the decrease in the former husband's financial ability to pay (the requisite substantial change in circumstances) has been brought about by the former husband's voluntary acts of, for example, permitting a thriving medical practice to be closed down and making no effort to seek other employment, see Kalmutz v. Kalmutz, 299 So.2d 30 (Fla. 4th DCA 1974); increasing his spending, Coe v. Coe, 352 So.2d 559 *1278 (Fla. 2d DCA 1977); or otherwise willfully divesting himself of the ability to pay, Bowen v. Bowen, 471 So.2d 1274 (Fla. 1985), then, most assuredly, the clean hands doctrine should have prevented the entry of the order under review which, inter alia, reduced the former husband's alimony and child support obligations established by the 1976 final judgment of dissolution as modified on appeal[1] and as upwardly modified by the trial court in 1980.
We have no quarrel with the trial judge's finding that Robert Waskin showed "a substantial decrease in his financial ability dating back to October of 1983." Certainly there is ample evidence to support his findings that, beginning in October 1983, Waskin spent $70,000 ($35,000 of which was borrowed from his sister) in newly-incurred attorneys' fees and lost a substantial number of patients and staff privileges at nursing homes and hospitals, which losses caused a severe drop in Waskin's income and thus his ability to meet certain existing obligations. The trial judge's conclusion, however, that this extraordinary expenditure on attorneys' fees and the reduction in income from the medical practice were matters beyond Waskin's control is, in our view, totally unwarranted.
The events of October 1983 which led to Waskin's subsequent financial ills are fully recounted in our recent opinion in State v. Waskin, 481 So.2d 492 (Fla. 3d DCA 1985). There we reversed the dismissal of a criminal information charging Waskin with soliciting someone to murder his former wife, Gloria Waskin, the appellant here. In resurrecting the charge and returning the case for trial, we set out in detail the conversation between Waskin and the prospective hitman (in actuality, Tom Tretola, an undercover police officer), a conversation which, we noted, Waskin conceded took place. We concluded that
"[t]he conversation between the defendant and Tretola in the present case is, at the very least, susceptible of being understood by reasonable fact-finders as meaning that the defendant requested or encouraged, if not actually hired, Tretola to murder the ex-Mrs. Waskin. The fact that the time of performance was not agreed upon or even that it was postponed for several months, or that payment of money was not immediately made, does not mean that no request or encouragement occurred, or even that no agreement  hiring  had taken place.... Indeed it appears that the defendant's request to postpone the hit was not occasioned by any disagreement about the figure of $10,000, but rather was motivated by the defendant's professed need to have sufficient time to amass the cash for payment without calling attention to his plan by borrowing. Where, as here, the defendant clearly requested that Tretola do away with his ex-wife, neither the lack of agreement about the price, or lack of payment, makes any difference."

State v. Waskin, 481 So.2d at 498 (emphasis in original).
As a result of Waskin's request that Tretola do away with the former Mrs. Waskin, Waskin was arrested and charged; as a result of the charge, he hired an attorney and paid him $70,000; and, as a result of the attendant publicity, he lost patients and institutional affiliations, and thus income.
We have little difficulty concluding that Waskin's voluntary act in seeking to do away with his ex-wife  the epitome of unclean hands  was the cause of his financial woes. What Waskin did to bring about his financial downfall is, quite obviously, far more condemnable than closing down a lucrative practice, failing to seek gainful employment, or going on spending sprees. It does not matter in this proceeding whether Waskin is ultimately convicted of the crime with which he is charged, even as it did not matter, the trial court's finding to the contrary notwithstanding, that when Waskin's motion to modify was filed and ruled upon, the criminal charges against him then *1279 stood dismissed.[2] Whether a criminal jury concludes beyond a reasonable doubt that Waskin is guilty of solicitation, or, as happened, a trial judge in the criminal division concludes that Waskin's conversations with Tretola did not go far enough to become a crime, is simply not important in this matter of Waskin versus Waskin. What is important here is that the conversation between Waskin and Tretola indisputably occurred, that Waskin admittedly believed that Tretola was a "hitman," and that in the conversation Waskin indisputably requested Tretola to do away with the ex-Mrs. Waskin. Under these circumstances, it can be readily said that Waskin's acts brought about his own arrest and prosecution, as well as the financial consequences of those events, whatever the outcome of the criminal proceeding.[3]
Accordingly, we reverse the order below insofar as it reduced the alimony and child support payments and relieved Waskin of the responsibility to pay the monthly mortgage on the marital home. As counsel for the former wife correctly observes, the bitter irony of the trial court's ruling is that, in effect, it requires the children and former wife to defray the cost of Waskin's attorney, a result no less ironic than, as in the well-known anecdote, taking pity on the orphan who killed his parents.
For precisely the same reasons that Waskin was not entitled to have his existing obligations modified, the former wife was entitled to the entry of an order holding him in contempt. The former wife does not seek incarceration of Waskin. Indeed, she recognizes that the trial court's finding that Waskin is without the present ability to pay arrears, and thus to purge himself of contempt, precludes incarceration. See Bowen v. Bowen, 471 So.2d 1274. She does, however, seek a contempt adjudication, and she is entitled to that. The trial court is directed upon remand to adjudge Waskin in contempt and enter such further orders as the court deems appropriate to effect compliance with the court's support order. See Bowen v. Bowen, 471 So.2d at 1279; Leone v. Weed, 481 So.2d 103 (Fla. 4th DCA 1986).
Reversed and remanded.
NOTES
[1] See Waskin v. Waskin, 346 So.2d 1060 (Fla. 3d DCA 1977).
[2] We disagree entirely with the trial court's conclusion that:

"(E) Husband is entitled to this modification as his change in circumstances [was] due to acts which as a matter of law did not constitute a crime and as he did not purposefully divest himself of funds or purposefully put himself in a disadvantaged financial position through frivolous spending or indulgence, and [was] as a result of Husband's being taken off the staff of nursing homes, notwithstanding his presumption of innocence, and then finding of innocence as a matter of law, he therefore is not directly responsible."
[3] A different question would be presented if, for example, Waskin's defense to the charges was that no such conversation soliciting the murder of his ex-wife occurred. It might then be argued upon his exoneration that the adverse publicity resulting in loss of business and the expenses of defending himself were matters not caused by him and over which he had no control.