923 A.2d 607 (2007)
2007 VT 35
Christopher ROGERS
v.
Carla PARRISH.
No. 05-354.
Supreme Court of Vermont.
May 4, 2007.
*608 Rebecca G. Olson and Brice C. Simon of Olson & Simon, PLC, Stowe, for Plaintiff-Appellee.
Benjamin W. King of King Lashman & King, PLLC, Burlington, for Defendant-Appellant.
Present: REIBER, C.J., DOOLEY, JOHNSON, SKOGLUND and BURGESS, JJ.
¶ 1. BURGESS, J.
In Hawkes v. Spence we addressed the "seemingly irreconcilable conflict" that arises when a "custodial parent's interest in building a new life with the children" in a distant location is "pitted against the noncustodial parent's interest in maintaining a close relationship with the children." 2005 VT 57, ¶ 1, 178 Vt. 161, 878 A.2d 273. While acknowledging that "there is no precise formula" for resolving such conflicts, we adopted a governing standard and a nonexclusive list of relevant factors that trial courts must apply in determining whether a reexamination of parental rights and responsibilities in such circumstances is justified. Id. ¶ 13. Here, we are confronted with yet another difficult relocation dispute between two loving, capable parents, both of whom are intent on maintaining their current contact with the child, yet only one of whom can prevail. Such cases underscore yet again that this area of the law is not susceptible to precise formulas, and that we must permit trial courts  guided by the principles set forth in Hawkes  the latitude to exercise their discretion to reach reasonable decisions. As explained more fully below, that is what occurred here. Accordingly, we affirm the judgment.
¶ 2. The record evidence may be summarized as follows. The parties were married in 1996 and divorced in October 2003. They have two children who were approximately three years old and fourteen months old at the time of the parties' separation in October 2002, and six and four years old at the time of the proceedings below. The divorce judgment incorporated a stipulation between the parties granting mother sole physical rights and responsibilities and providing for shared legal rights and responsibilities. The judgment also accorded father substantial parent-child contact. In addition to visitation every other weekend from Friday until Monday evening, and off-weeks from Tuesday until Wednesday evening, it authorized father to pick the children up from daycare on a daily basis and bring them to mother's home, where he cared for them until she arrived from work. In addition, father testified, and the court found, that father made considerable efforts to see the children on other occasions, staying with neighbors and friends near the marital home (which father had conveyed to mother pursuant to the divorce stipulation), and spending time with the children during days off from his job as a police officer with the Stowe Police Department.
¶ 3. Father testified, and the court found, that mother's job as the comptroller of a company in Burlington made it difficult for her to arrive home until after 6:00 p.m., which in turn made it impossible for father to pick up the children daily from daycare and arrive for his police shift on time. Father advised that he could no longer do the daily pickups. As a result, in June 2004, mother moved from Morrisville to Vergennes to shorten her commute time. Thereafter, father's time with the *609 children decreased. According to mother, this was because father no longer wished to exercise all of his visitation rights, while father contended that mother denied him visitation. Finding mother's excuse incredible for denying father's Thanksgiving visit so she could take the children to see her boyfriend's parents in Michigan, the court further found it was mother, and not father, who initiated the lapse in father's visitation.
¶ 4. In November 2004, mother informed father that she intended to remarry and move with the children and her new husband, an Army sergeant then stationed in Vermont, to North Carolina. Father subsequently moved to modify custody based on mother's move to Vergennes and the disruptions that this had occasioned in the children's lives, including a change of daycare providers and reduced contact with father and his family, as well as on mother's contemplated move to North Carolina. Mother, in response, filed a cross-motion to modify custody and parent-child contact, seeking sole legal rights and responsibilities and a new visitation schedule. In a supporting affidavit, mother denied she was considering a move to North Carolina, stating that her new husband "has no orders at present to be transferred to anywhere let alone North Carolina." Mother later filed an amended motion and supplemental affidavit, indicating that her husband's replacement had arrived in Vermont and it was expected that within about 30 days her husband would receive orders to report to a new duty station outside Vermont, possibly in the states of North Carolina, Colorado, or Washington. As to mother's earlier affidavit purporting ignorance about any orders requiring her husband to move, the court found that mother, contrary to her sworn declaration, was then aware that her husband had standing orders to leave Vermont and relocate within nine months at the latest.
¶ 5. An evidentiary hearing on the cross-motions was held in August 2005. Shortly thereafter, the court issued a written decision, concluding that mother's proposed relocation represented a real, substantial, and unanticipated change of circumstances justifying a reexamination of parental rights and responsibilities under 15 V.S.A. § 668, and that, under the criteria set forth in 15 V.S.A. § 665, the best interests of the children favored an award of sole physical and legal rights and responsibilities to father. In addressing the threshold question of changed circumstances, the court recognized that the issue was governed by the principles set forth in Hawkes v. Spence. There, we held that "relocation is a substantial change of circumstances justifying a reexamination of parental rights and responsibilities only when the relocation significantly impairs either parent's ability to exercise responsibilities the parent has been exercising or attempting to exercise under the parenting plan." Hawkes, 2005 VT 57, ¶ 13, 178 Vt. 161, 878 A.2d 273 (quotation and citation omitted).
¶ 6. Hawkes explained that in determining whether a parent's exercise of responsibilities will be substantially impaired, the court may consider, among other factors, "[t]he amount of custodial responsibility each parent has been exercising and for how long, the distance of the move and its duration, and the availability of alternative visitation arrangements." Id. (quotation and citation omitted). Additionally, "the court should consider the amount of custodial responsibility that a parent has been actually exercising, rather than the amount allocated but not necessarily exercised under a court order." Id. (quotation and citation omitted) (emphasis added).
¶ 7. The trial court here systematically considered each of the foregoing factors. *610 As to custodial time, the court found that, although mother had been granted sole physical rights and responsibilities, father had "maximized his contact with the children such that he had them in his care almost as much as [mother]." Next, the court found that the distance and duration of mother's proposed move to a military posting out of state were extensive, and would substantially affect the children's ability to maintain their current relationship with father and his family in Vermont. Finally, the court found that mother's proposed summer and holiday visitation schedule with father would significantly diminish his contact with the children and "negatively impact their relationship." Indeed, given its findings that mother previously denied father's visitation rights, the court justifiably expressed "some concerns that a[n alternative] visitation order would not be adhered to by [mother]."
¶ 8. The court thus determined that "[e]ach of the Hawkes factors, as well as many others, support the court's conclusion that the proposed relocation is a real, substantial and unanticipated change in circumstances requiring the court to consider whether modification of the parties' parental rights and responsibilities is appropriate." Turning to that question, the court remarked that father bore "a heavy burden of proof," presumably in reference to the "high hurdle" faced by a noncustodial parent "in justifying the violent dislocation of a change in custody from one parent to the other" when the change is "based solely on the custodial parent's decision to relocate." Hawkes, 2005 VT 57, ¶ 11, 178 Vt. 161, 878 A.2d 273. "On the other hand," the court correctly observed from Hawkes, "when childrearing and its concomitant decision-making are shared, relocation to a remote location by one parent requires at the very least a reassessment of the custodial arrangement and, because of the practicalities involved in shared parenting, will often necessitate a change in custody." Id. ¶ 12. The court also noted that father's motion was not based solely on the proposed relocation, but also on a general breakdown in the parties' relationship, mother's interference with father's visitation and a concern that the children would continue to move every three years if left in mother's physical custody.
¶ 9. Proceeding to apply the factors of 15 V.S.A. § 665(b), the court found both parents were close to the children and were able to provide them with love, affection, and guidance, as well as a safe and nurturing environment, and that these factors were therefore evenly balanced. The court placed considerable emphasis, however, on the criterion addressed to the children's adjustment to their home, school, and community  particularly in Morrisville where they had lived near father prior to the move, attended day care, and been surrounded by friends and family. The court noted father planned to live in Morrisville, where the children could resume their schooling and relationships with friends, neighbors, and family. The court found that this factor weighed heavily in favor of a change of custody to father.
¶ 10. The court found neither parent particularly able to foster a positive relationship with the other. Nevertheless, the court expressed concern that mother had not been straightforward with father or the court about her future plans, had not cooperated with father's visitation rights in the past and was more likely than father to expose the children to disputes between the parents and alienation from the other parent. In contrast, the court found that father was more likely to follow an order granting mother substantial visitation, and was less likely than mother to disparage, or alienate the children from, the other parent.
*611 ¶ 11. Consistent with its finding that the children were strongly attached to their home and community, the court also found that they enjoyed "strong, beneficial relationships with family and friends in Vermont" that would be damaged by a relocation out of state. While acknowledging the "positive force" of their new relationship with mother's husband and his young daughter, the court concluded that it did not outweigh the children's relationship with father and other family members and friends in Vermont, and that this factor also favored an award of sole custody to father.
¶ 12. As for the children's relationship with their primary care provider, the court recognized that mother capably fulfilled this role and that the children would not benefit from a disruption of this relationship  a circumstance which led the court to describe this as a "most troubling" and "difficult case." Noting that father could also fill the role of primary caretaker, and had "approximated" that role in the past, the court explained that this factor weighed heavily in mother's favor, but was counterbalanced by other factors. The court determined that, despite mother's status as primary caretaker, the expected repeated moves of the children and lost contact with father were unacceptable consequences of mother's decision to move only to follow her new spouse's career. The dissent perceives this characterization as trivializing and devaluing mother's choice to support her spouse's career, post, ¶ 45, when the family court clearly considered this motive, not in isolation, but weighed against the reasonably anticipated constriction, if not foreclosure, by mother of the children's contact with father. The family court found mother's rationale less compelling than the sacrifice of the children's relationship with their father.
¶ 13. On balance, the court concluded that an award of sole legal and physical rights and responsibilities to father was "most likely to preserve the children's relationship with both of their parents and afford them the greatest amount of stability and security," and therefore served the best interests of the children. The court awarded mother substantial parent-child contact, including every school vacation during the school year in excess of three days, eight consecutive weeks during the summer, one weekend per month in Vermont, and unlimited telephone contact. The court denied mother's subsequent motion for reconsideration and stay. This appeal followed.
¶ 14. Mother raises a number of claims, which she has grouped under three broad headings. Under the first, she contends the court misapplied the Hawkes factors in concluding that a relocation would significantly impair father's exercise of custodial responsibilities. She claims, in this regard, that the court impermissibly lowered the standard for a change of custody from the primary care provider. The claim is premised on mother's assertion that, in calculating the overall amount of custodial responsibility exercised by father, the court mischaracterized father's involvement with the children as nearly equivalent to that of mother. She argues that the quantity of father's contact with the children, which the court found to be approximately twelve out of fourteen days prior to mother's move to Vergennes, was not equivalent to the quality of her daily involvement as the primary care provider.
¶ 15. We will not disturb the family court's factual findings unless, viewing the evidence in the light most favorable to the judgment and excluding the effect of modifying evidence, there is no credible evidence to support them. Sochin v. Sochin, 2004 VT 85, ¶ 10, 177 Vt. 540, 861 *612 A.2d 1089 (mem.). Father testified that he engaged in extensive activities with the children while they were in his care, including playing, coloring, going on outings, reading stories at bedtime, and shopping.[1] He also testified without dispute that he had taken care of the children for consecutive periods of over a week at a time. The parties' friend and former neighbor in Morrisville described father as "Mr. Mom" and "an exceptional father," observing that he had "spent a tremendous amount of time with the kids and did a lot of stuff with them and took care of them and nurtured them." The evidence was sufficient to support the court's finding that father's care of the children nearly approximated mother's in the qualitative sense, and we therefore discern no basis to disturb its conclusion that mother's proposed relocation, combined with her disinclination to abide by father's interest and rights to parent-child contact, would likely erode or destroy the children's relationship with their father.
¶ 16. Mother further argues that "it is of no moment as to who was responsible for [father's] reduced parent child contact" after she moved to Vergennes, relying on a comment to § 2.17(1) of the American Law Institute (ALI) Principles of the Law of Family Dissolution, which states that, where one parent has interfered with the other's custodial time, "a parent who acquiesces in the new arrangements cannot later rely on parental prerogatives the parent did not value highly enough to protect." ALI Principles of the Law of Family Dissolution § 2.17(1) cmt. b (2002). Here, as noted, the court acknowledged that father's contact with the children decreased since mother's move to Vergennes, but found that mother was partly to blame by interfering with father's visitation. Nothing indicates, however, that father "acquiesced" to mother's conduct. Accordingly, the claim does not undermine the court's finding that the proposed relocation would significantly impair father's relationship with the children.
¶ 17. Mother also appears to take issue with the court's finding that the distance and duration of the proposed relocation would be substantial. Mother asserts that the finding is "speculative at best" because her husband had not, as of the date of the hearing, received his transfer orders. Mother stated in her supplemental affidavit, however, that reassignment orders were imminent, and testified at the hearing in August 2005 that January 2006 was the "absolute end date" for her husband's assignment to Vermont. Wife's husband also testified that he could receive orders to relocate at any time, possibly to Washington state, Colorado, Georgia, or North Carolina, and that there was virtually no possibility of being reassigned to Vermont. Thus, the evidence does not support mother's assertion that the court's findings about relocation were speculative.
¶ 18. Finally in this regard, mother claims the evidence refuted the court's finding that the alternative visitation schedule necessitated by mother's relocation would significantly affect father's relationship with the children. In support, mother cites father's testimony that he remained committed to staying involved with the children even if it meant he had to fly long distances, as well as the testimony of the children's paternal grandmother that, while she did not enjoy flying, she would endeavor to drive to see the *613 children if they relocated to a state not too distant from Vermont. While these statements attest to the father's commitment to maintaining contact with the children wherever they resided, they do not undermine the court's finding that a relocation would significantly impair father's ability to exercise existing custodial responsibilities, particularly considering mother's past refusal of father's visitation rights and her continued reluctance to fully accept same as suggested by her lack of candor to the court in misreporting her probability for relocation.
¶ 19. Mother's second general claim is that the court misapplied the statutory factors governing the best interests of the children. In particular, mother contends the court failed to accord the quality of her relationship with the children the "great weight" to which she was entitled as their primary caretaking parent under Harris v. Harris, 149 Vt. 410, 418, 546 A.2d 208, 214 (1988) (holding that where one parent is established as the primary caretaker, "this factor should be entitled to great weight unless the primary custodian is unfit."). This factor's "great weight," however, is not necessarily overwhelming weight, as Harris goes on to observe that "[t]he exact weight cannot be determined unless there is evidence of the likely effect of the change of custodian on the child. In the absence of such evidence, the court should ordinarily find that the child should remain with the primary custodian parent if that parent is fit." Id. at 418-19, 546 A.2d at 214. The record here is replete with evidence and findings by the court that transferring custody to father would more likely preserve the father-child relationship, and so preserve the children's relationship with both parents, would more likely promote visitation between the children and noncustodial parent, would be less likely to expose the children to parental disparagement and alienation, and would more likely preserve and maintain the children's beneficial relationships with community, friends and family. The beneficial qualities of mother's caretaking relationship with the children were tempered by her willingness to sacrifice the children's beneficial relationship with their father for her husband's career when, at the same time, she could not be relied upon to observe the father's visitation rights.
¶ 20. The great weight of mother's primary and beneficial custodianship was overcome, in the court's view, by the risk of destruction to their relationship with father and by the accumulated weight of other factors favoring a change of custody to preserve the children's relationships with both parents and minimize disruption to their stable relationships to family, friends, home and community. As noted earlier, the court found  based on credible evidence  that father's involvement in caretaking was nearly that of mother's, and that mother's "primary" status was maintained, in part, by denying father visitation once he could no longer pick up the children at day care. Thus, the evidence supported the court's characterization of a custodial change in this case as a less-than-extreme result warranted by the best interests of the children. See Hawkes, 2005 VT 57, ¶ 12, 178 Vt. 161, 878 A.2d 273 (reaffirming earlier holdings that, when parties' actual parenting arrangements are shared, practicalities of relocation may often necessitate a change of custody). That the evidence could have been weighed or balanced differently towards a different result does not render the court's opposite conclusions an abuse of discretion. See Chick v. Chick, 2004 VT 7, ¶ 10, 176 Vt. 580, 844 A.2d 747 (mem.) (in evaluating best-interest factors under § 665(b), "[w]e afford the trial court wide discretion . . . to assess the credibility of witnesses and weigh the evidence"). Accordingly, we *614 find no merit to the claim that the court applied an incorrect standard or failed to defer adequately to mother's role as the primary care provider.
¶ 21. Mother next contends the court improperly substituted its judgment for mother's in expressing its reservations about the children being subject to "repeated moves" due to future military reassignments. The court opined that such moves were "unlikely to benefit [the children] in any significant way and may be severely detrimental." The court's comment about lack of benefit was without evident foundation. Nothing suggested that these children, or children in military families, or "corporate families" for that matter, expecting to move more frequently than others, do not benefit from cyclical relocation. Erroneous or unsupported findings do not require reversal, however, unless they are shown to have been prejudicial. Lyddy v. Lyddy, 173 Vt. 493, 496-97, 787 A.2d 506, 512 (2001) (mem.) (holding that inaccurate findings did not require reversal where "they were not controlling with respect to the court's ultimate decision to award custody to mother"); Myott v. Myott, 149 Vt. 573, 577, 547 A.2d 1336, 1339 (1988) (party alleging error has burden of showing that he or she was prejudiced thereby).
¶ 22. The court invoked its concern several times over effects on the children of moving every three years far from father and their surroundings. Criticizing this concern as the family court simply substituting its "value judgment" for the mother's, post, ¶ 34, the dissent ignores the more complicating factor of mother's demonstrated reluctance to honor father's visitation rights and her lack of interest in maintaining the children's relationship with father. Reading the family court's decision in its entirety, however, leaves no doubt that the court's award of custody to father was not based on a belief that cyclical relocation was "severely detrimental" per se, as opposed to being severely detrimental because of the particular surrounding circumstances in this case. Rather, the court incorporated its reservations about repetitive relocation in the context of its other findings, supported by the evidence, that the children stood to lose their stable relationship with family, friends, school and community here, as well as the relationship with their father due to mother's proven reluctance to foster it.[2]
¶ 23. The decisive factor was not, as seen by the dissent, the frequency of moving, but the court's concern that mother could not be relied upon to abide by a visitation order and that distant relocations would aggravate, rather than mitigate, that situation. The court's reference to repeated moves was part and parcel of its overall conclusion that continued custody with mother was more likely to disrupt, if not destroy, the children's relationship with father. This conclusion was supported by the evidence of mother's noncompliant attitude towards visitation, her disregard for the children's relationship with father and the distance of her expected moves. These expected detrimental effects, and not the lack of benefit, appeared to drive the court's conclusions relative to future moves, so that mother was not prejudiced by the erroneous characterization of repeated relocations as "unlikely to benefit [the children] in any significant way."
*615 ¶ 24. Relocation, by itself, is no basis to reassign custody. In this case, however, when combined with disruption of the children's stability and the likely substantial, if not total, loss of relationship with their father, the anticipated moves by mother were fairly considered. That repetitive relocation must be balanced against an arguably more stable "quality of the child's adjustment to . . . present housing, school and community," 15 V.S.A. § 665(b)(4), the child's established relationships with father and other significant family and friends, id. § 665(b)(7), leavened, or not, by the parents' relationship with one another, id. § 665(b)(5), as well as "the quality of the child's relationship with the primary care provider," id. § 665(b)(6), are all a function of the statute and not merely the court's predilection. Likewise, the court's weighing of mother's decision to follow her husband's career at the expense of the children's relationship with their father is also a requirement of the statute's mandate to consider the relative merits of the parents' "ability and disposition. . . to meet the child's present and future developmental needs," id. § 665(b)(3), as well as "foster a positive relationship" with the other parent. Id. § 665(b)(5).
¶ 25. Transfer of physical custody of the children to father was supported by the court's findings and balancing of the statutory factors. Courts consider these factors to promote the legislative declaration that, upon divorce of parents, "it is in the best interests of their minor child to have the opportunity for maximum continuing physical and emotional contact with both parents." Id. § 650.[3] Boiled down, the court explained that after weighing the evidence and balancing the factors, father could be relied upon to maintain the children's contact with the other parent, but mother could not be relied upon to do the same. Thus, custody with father was more likely to accomplish continuing maximum contact with both parents, while maintaining custody with mother was less likely to achieve that goal considering the risk, based on history, that even minimum contact with father would have withered on mother's watch. Because the court's findings, conclusions and exercise of discretion thereon were all tenable, at the least, "[w]e therefore think that no abuse of discretion appears." Dyer v. Lalor, 94 Vt. 103, 117, 109 A. 30, 36 (1920).
¶ 26. That the dissent, or even this entire Court, might reach a different conclusion on the same facts does not mean that the family court abused its discretion. Id. at 116, 109 A. at 36. Discretion necessarily allows for a range of reaction, so long as it is founded, as it is here, on reasons supported by evidence. Reasonable judges can differ in their response, but a "difference in judicial opinion is not synonymous with abuse of judicial discretion." *616 Id. (quotations omitted); Houran v. Preferred Acc. Ins. Co. of N.Y., 109 Vt. 258, 269, 195 A. 253, 257 (1937), abrogated on other grounds by Coop. Fire Ins. Ass'n of Vt. v. White Caps, Inc., 166 Vt. 355, 694 A.2d 34 (1997).
¶ 27. Mother further contends that, in applying the best-interests criteria, the court failed to consider testimony by the children's current daycare provider concerning their positive transition to Vergennes, "unreasonably minimized" evidence that the children had formed a close relationship with mother's husband and his daughter from a prior marriage, and erroneously equated the parties' ability to meet the children's needs despite evidence that father had not visited the children's school or preschool in Vergennes. Although the argument overlooks substantial modifying evidence  including father's testimony that he phoned his daughter's school frequently and requested that all school notices and report cards be mailed to him  the claim at bottom goes to the weight to be accorded the evidence, a decision that lies within the trial court's broad discretion. Chick, 2004 VT 7, ¶ 10, 176 Vt. 580, 844 A.2d 747. There is no basis upon which to conclude that the court abused this discretion here.
¶ 28. Mother also claims there was no evidence to support the court's stated concern that she might deny or interfere with father's visitation in the event of a significant relocation out of state. The finding was based on father's testimony concerning specific incidents in which mother had denied, or made it difficult for him to exercise, his visitation in the past, and his additional testimony that she had threatened her own family with a denial of access to the children. Mother disputed the assertion, and cited evidence that she had recently cooperated with father in executing a modified visitation schedule for the summer of 2005. As noted, however, the trial court has considerable discretion to assess the credibility of witnesses and weigh the evidence, and we will not disturb its findings unless clearly erroneous. Id.; Sochin, 2004 VT 85, ¶ 10, 177 Vt. 540, 861 A.2d 1089. Assessed in light of this standard, and given that mother was less than forthright in her previous sworn statement, the evidence, while not extensive, was sufficient to support the finding.
¶ 29. Finally in this regard, mother contends the court abused its discretion by admitting parol evidence to show that father's motive in stipulating to an assignment to mother of his equity in the marital home was to ensure that mother could afford to keep the children in their own home in Morrisville. Mother failed to object to the testimony on this ground, and therefore failed to preserve the issue for review on appeal. In re Merritt, 2003 VT 84, ¶ 7, 175 Vt. 624, 833 A.2d 1278 (mem.).
¶ 30. Mother's third, and final, general contention consists of nine separate trial court findings allegedly unsupported by the evidence. Several of these, including father's substantial involvement in the children's custodial care, have been previously addressed. As to the remainder, mother makes virtually no claim or showing that the alleged inaccuracies, whether considered singly or in combination, undermine the court's ultimate decision to award custody to father. See Lyddy, 173 Vt. at 496, 787 A.2d at 512 (holding that inaccurate findings did not require reversal of judgment where father failed to demonstrate they affected "the court's ultimate decision to award custody to mother"). We discern no basis to disturb the judgment.
Affirmed.
¶ 31. JOHNSON, J., dissenting.
I respectfully dissent. In this case, the family court transferred custody of two *617 young children away from their mother, who had been the children's primary care provider since their birth. It was undisputed that the children had a strong and positive bond with their mother, as well as with her new husband and his young daughter, and that the five of them had been living together as a tightly knit family unit for more than a year at the time of the hearing.
¶ 32. Nonetheless, the family court transferred custody away from mother because her new husband was serving in the military and would be required to move every three years as a result. As the majority acknowledges, the family court's finding that such repeated moves would be detrimental to the children is entirely without evidentiary support. The majority excuses this error, however, concluding that the finding was not critical to the custody analysis. To the contrary, this unsupported finding was a decisive factor in justifying the family court's conclusion that the children should be placed with father. Striking the finding  as we must  necessitates reversal of the family court's decision. See Maurer v. Maurer, 2005 VT 26, ¶¶ 11-13, 178 Vt. 489, 872 A.2d 326 (mem.) (reversing transfer of custody where findings did not support conclusions regarding best interests of children).
¶ 33. In addition, the family court inappropriately disparaged mother's motivation for the relocation: supporting her husband's career in the military. Thus, the family court erred by substituting its judgment about the advisability of relocation for that of mother, the custodial parent. Hawkes v. Spence, 2005 VT 57, ¶ 11, 178 Vt. 161, 878 A.2d 273 (holding that family court should not substitute its judgment for that of the custodial parent regarding relocation decision). In fact, under principles set forth by the American Law Institute  an authority we have previously followed with respect to the issues surrounding parental relocation  accommodation of a spouse's job opportunity is a presumptively valid reason for relocating one's family.
¶ 34. In short, instead of deciding what was best for the children  particularly in terms of preserving their positive relationship with their life-long primary care provider and maintaining continuity in their family unit  the court made a value judgment regarding each parent's choice of where to live. In the absence of any evidence that relocation would be detrimental to the children  and there was no such evidence here  it was an abuse of discretion to transfer custody away from mother.

I.
¶ 35. In the course of deciding to transfer custody to father, the family court repeatedly emphasized that mother would need to relocate the family approximately every three years because her husband was in military service. The court concluded that, "[a]lthough a single relocation to another state may be something the children could adjust to without substantial detrimental effect, repeated moves every three years to a new state is unlikely to benefit them in any significant way and may be severely detrimental." Beyond the problematic implications of this statement for the custody rights of parents in military families in general, the finding is completely unsupported. The majority acknowledges that the family court's statement was "without evident foundation." Ante, ¶ 21. Nonetheless, the majority dispenses with the issue by noting that "[e]rroneous or unsupported findings do not require reversal . . . unless they are shown to have been prejudicial." Ante, ¶ 21. Because the finding was considered "in the context of other findings," the majority concludes that "mother was not prejudiced *618 by the erroneous characterization of repeated relocations." Ante, ¶¶ 22-23. I cannot agree. Review of the family court's analysis reveals that the error was, in fact, prejudicial, both because it was the decisive factor in the family court's seven-factor analysis and because this unsupported finding influenced analysis of the other statutory factors.
¶ 36. 15 V.S.A. § 665(b) mandates consideration of the following factors in determining whether a change is in the best interests of the child:[4]
(1) the relationship of the child with each parent and the ability and disposition of each parent to provide the child with love, affection and guidance;
(2) the ability and disposition of each parent to assure that the child receives adequate food, clothing, medical care, other material needs and a safe environment;
(3) the ability and disposition of each parent to meet the child's present and future developmental needs;
(4) the quality of the child's adjustment to the child's present housing, school and community and the potential effect of any change;
(5) the ability and disposition of each parent to foster a positive relationship and frequent and continuing contact with the other parent, including physical contact . . .;
(6) the quality of the child's relationship with the primary care provider, if appropriate given the child's age and development; [and]
(7) the relationship of the child with any other person who may significantly affect the child.
¶ 37. In this case, the family court's resolution of factor (4)  "the quality of the child's adjustment to the child's present housing, school and community and the potential effect of any change," § 665(b)(4)  was determined in father's favor solely on the basis of the erroneous finding that repeated moves were per se detrimental. As discussed below, the six other factors in the analysis were closely balanced as between mother and father. Thus, the custody determination was a difficult and close case where each factor was significant. Under these circumstances, prejudice necessarily resulted from the family court's error.
¶ 38. Specifically, with regard to factors (1), (2) & (3), the family court concluded that mother and father were equally situated. Another set of three factors essentially were split between the parents. Regarding each parent's ability to foster a relationship with the other parent (factor (5)), the family court determined that neither mother nor father had performed well in this area to date, but speculated that father would be more compliant in the future with any visitation schedule established by the court.[5] In terms of providing *619 the children with contact with other important individuals, such as relatives and friends (factor (7)), the family court again concluded that this factor favored placement with father. In terms of the children's bond with their primary care provider (factor (6)), the family court acknowledged that mother had taken care of the children since the day they were born, and that this factor favored placement with mother. Furthermore, in accordance with our case law, the family court acknowledged that this factor was to be accorded "great weight." Nickerson v. Nickerson, 158 Vt. 85, 89, 605 A.2d 1331, 1333 (1992). In light of the additional weight accorded factor (6), placement with mother or father was equally desirable under the best-interests analysis.
¶ 39. In analyzing the decisive factor  the child's adjustment to present home, school, community and effect of any change (factor (4))  the court concluded that, "[a]lthough a single relocation to another state may be something the children could adjust to without substantial detrimental effect, repeated moves every three years to a new state is unlikely to benefit them in any significant way and may be severely detrimental." The court further commented that "[t]he proposed relocations are solely attributable to Mr. Parrish's career choice," implying that this motive for the move was somehow obviously or inherently insufficient. (Emphasis added.) Significantly, the family court did not mention, much less analyze, the children's adjustment to the "violent dislocation" involved in the change of custody itself, Hawkes, 2005 VT 57, ¶ 11, 178 Vt. 161, 878 A.2d 273, nor did the court discuss how no longer living with their life-long primary care provider might negatively affect the children's well-being. Thus, not only did analysis of this pivotal factor turn on a finding for which there was no evidentiary support, it was not tempered by the obvious and important aspect of the contemplated change in custody that favored placement remaining with mother.
¶ 40. In addition, the erroneous finding had disproportionate influence because the family court injected it into consideration of other factors. In essence, the family court made a methodological error by mingling consideration of the statutory factors with one another, counting some of the factors twice. For example, in analyzing the quality of the children's relationship with their primary care provider (factor (6)), the court acknowledged that mother had been the primary care provider for both children since their birth, but balanced this against the fact that they would be subject to "repeated moves" if they remained in mother's care. The effect of these "repeated moves," however, should have been considered  if at all  only in conjunction with factor (4). Instead, the family court undercut the one factor that most clearly favored placement with mother before that factor was balanced against the others. This distorted the proper weight to be given each factor in the analysis.
¶ 41. Similarly, in concluding that placement with father was more likely to preserve the children's relationships with other significant individuals (factor (7)), the court briefly acknowledged the positive relationship between the children and *620 mother's new husband, Matt Parrish,[6] but concluded that "the children's new relationships with Mr. Parrish and his daughter, however beneficial, should not take precedence over their relationships with their father and other family members and friends who reside in Vermont."[7] (Emphasis added.) But the children's relationship with their father is to be analyzed separately under factor (1). By weighing the children's relationship with their stepfather and stepsister against their relationship with one of their parents (father), the family court again skewed the statutory analysis.
¶ 42. It is of course true that the family court has broad discretion regarding matters of child custody. Nonetheless, the discretion is not unbound; it is guided and limited by the statutory factors. Accordingly, while there is no prescribed format for the family court's findings, it must consider each of the statutory factors, Sochin v. Sochin, 2005 VT 36, ¶ 6, 178 Vt. 535, 872 A.2d 373 (mem.), and make findings on as many statutory factors as the evidence will support, Putnam v. Putnam, 166 Vt. 108, 116, 689 A.2d 446, 451 (1996). Here, the family court allowed the unsupported conclusion regarding the effect of repeated moves to trump the other statutory factors, thereby truncating what should have been a complete analysis of each factor individually. In an area of law that is particularly prone to value judgments, the process of considering and weighing the factors enumerated by the Legislature imposes some measure of balance and consistency on what could otherwise be a subjective and undisciplined approach to decision-making. The statutory factors provide a standard against which to assess the adequacy of the decision-making process. To the extent the family court departs from the statutory factors, and the weight of certain factors is distorted, the family court's decision goes beyond being a discretionary one; meaningful appellate review becomes nearly impossible. This is not consistent with substantial justice.
¶ 43. The majority seeks to minimize the impact of the family court's unsupported conclusion regarding the effect of repeated moves on the children by arguing that the family court was really talking about the impact of repeated moves on father's visitation rights. This effort is unavailing. While the propensity of each parent to foster visitation was properly considered under factor (5) of the analysis, factor (4) considers solely the adjustment of the children to the proposed changes. It is in this context that the family court determined that repeated moves would be detrimental, and it is this conclusion that lacks any support. The fact that a long-distance move (repeated or not) might exacerbate mother's disinclination to foster *621 visitation is a separate consideration, and does not affect the validity of the analysis offered by this dissent.
¶ 44. The notion that repeated moves would be harmful to the children was the repeated theme of the family court's decision. That conclusion was admittedly without evidentiary support. The error was prejudicial and requires reversal.

II.
¶ 45. The family court also erred by substituting its judgment for that of the custodial parent, specifically by passing negative judgment on mother's decision to relocate her family in support of her husband's career. For example, the family court noted that "[t]he proposed relocations are solely attributable to Mr. Parrish's career' choice." (Emphasis added.) Similarly, the majority accepts the family court's determination "that, despite mother's status as primary caretaker, the expected repeated moves of the children and lost contact with father were unacceptable consequences of mother's decision to move only to follow her new spouse's career." Ante, ¶ 12 (emphasis added). The terms "solely" and "only" trivialize and devalue mother's choice to support her spouse's career. We have held that "the family court, in considering the children's best interests, must give deference to the custodial parent's choice of residency and may not substitute its judgment for that of the custodial parent merely because the court would have done something different if it had been the parent." Hawkes, 2005 VT 57, ¶ 11, 178 Vt. 161, 878 A.2d 273 (internal quotation omitted).
¶ 46. The need for deference to a parent's choice is well-grounded in policy reasons:
Deference to the custodial parent's decision to relocate . . . obviate[s] de novo consideration of who is best suited to have custody, an issue which has already been resolved once by the courts. . . . Second, it . . . tend[s] to maintain the child in the family unit to which he or she currently belongs, and minimize judicial interference with decisions which affect that family unit. . . . Finally, it places the decision with the person best able to consider the child's needs.
Lane v. Schenck, 158 Vt. 489, 495, 614 A.2d 786, 789 (1992) (quotation omitted). All of these principles  avoiding duplication of judicial effort, maintaining the stability of the family unit, and leaving decision-making to the custodial parent  are abandoned where, as here, the decision of the custodial parent to relocate is used as an opportunity to reopen the difficult question of primary custody. Given that the best interests of the child is supposed to be the polestar of the analysis, it is especially troubling that such an approach tends to place a low priority on maintaining consistency in the family unit  a result that is readily apparent in the instant case.[8] As we noted in Lane, "[t]he place of residence for a family is central to childrearing, and thus that decision is understandably entrusted to the parent awarded parental rights and responsibilities." Id. at 495, 614 A.2d at 789. "Mere disagreement" with a parent's decision to relocate is not a sufficient basis for transferring custody away from that parent. Id. at 496, 614 A.2d at 789.
¶ 47. The restraint we advocated in Lane is consistent with the American Law *622 Institute Principles of the Law of Family Dissolution, which we have otherwise relied on to resolve difficult issues related to parental relocation.[9] The ALI approach on this precise issue  which has not been adopted in Vermont  is to allow relocation by the custodial parent where the motive for the decision is valid and the decision has been made in good faith. ALI Principles of the Law of Family Dissolution § 2.17(4)(a) (2002). Under this framework, "if a parent has been exercising a clear majority of custodial responsibility and the move is in good faith, no further analysis is required. The court is not permitted to prevent a relocation simply because it determines that such a relocation would not, on balance, be best for the child." Id. § 2.17 cmt. d. Rather, the move is permitted, and visitation schedules are altered accordingly, primarily by shifting from more frequent, shorter visits to less frequent but more extensive visits. With this approach, the best-interests analysis is broached only if the custodial parent fails to show that the relocation is for a valid purpose, in good faith, and to a location that is reasonable in light of the purpose. Id. § 2.17(4)(b).
¶ 48. As the comments to this section explain, "[t]he Principles reflect . . . [an] emphasis on maintaining continuity in caretaking, and the view that when the child has had one clearly primary caretaker, the best interests of the child are more closely tied to the interests and quality of life of that caretaker than to the other parent." Id. § 2.17 cmt. a. In connection with this approach, the section recognizes a number of presumptively valid motives for a custodial parent's decision to relocate the family, including "to be with one's spouse or domestic partner who lives in, or is pursuing a significant employment or educational opportunity in, the new location." Id. § 2.17(4)(a)(ii)(5).
¶ 49. Vermont has not adopted the ALI framework to the extent the ALI principles recognize presumptively valid motives for relocation that preclude reopening the subjective and divisive best-interests analysis. Nonetheless, we have consistently held that Vermont courts should refrain from second-guessing the validity of a custodial parent's decision to relocate based on subjective and value-laden considerations, and this is consistent with the thrust of the ALI approach. Absent such restraint, the "violent dislocation" of transferring custody is too lightly entered into, as it was in this case.
¶ 50. In sum, not only was the pivotal finding in this case unsupported by any evidence, it represented an instance of the family court inappropriately substituting its judgment for that of the custodial parent. The custody order should be reversed.
¶ 51. I am authorized to state that Justice SKOGLUND joins this dissent.
NOTES
[1] Father acknowledged that, during shopping visits, his girlfriend helped pick out clothes and shoes for his daughter, and that he was therefore unaware of his daughter's shoe size. Contrary to mother's assertion, however, we are not persuaded that such ignorance undermines the court's finding concerning father's extensive role in the care of the children.
[2] The dissent's claim that no evidence supported the family court's conclusion that repeated relocation would be detrimental to the children, post, ¶ 34, fails to acknowledge as detrimental mother's degradation of father's visitation rights, her dishonesty in connection with her plans to move, and her unjustified estrangement of the children from their father.
[3] The dissent contends it was error for the family court to accord some degree of preference to maintaining the children's relationship with their father over the stepfather, when their relationship with the stepfather was also beneficial. Post, ¶ 41. We do not agree that consideration of father's status must be limited, as urged by the dissent, to each child's relationship to him and his capacity to "provide the child with love, affection and guidance" as outlined as one of the "best interests of the child" factors under 15 V.S.A. § 665(b)(1). This argument appears settled by the Legislature's additional and explicit declaration of public policy in § 650 that, at the least, presumes continued maximum parent-child contact "is in the best interests" of the children, "unless direct physical harm or significant emotional harm to the child or parent is likely to result from such contact." Id. (emphasis added). Neither type of harm was alleged here, and the family court was persuaded that the children's continued contact with "both parents," the ultimate legislative goal, was not reasonably likely if physical custody vested in mother.
[4] The court deemed two of the statutory factors  regarding shared parental rights and responsibilities and evidence of abuse  irrelevant. 15 V.S.A. § 665(b)(8) & (9).
[5] While this statement may reflect the family court's assessment of the parties' credibility, there is nothing in the substance of the parties' testimony supporting this conclusion. To the contrary, both parents and their new partners expressed a commitment to facilitating the children's contact with the noncustodial parent. To the extent the family court and the majority conclude that mother affirmatively alienated the children from father, I do not believe such a conclusion is supported by the record. Rather, the testimony established that mother moved from the marital home only in response to father's decision to stop picking up the children from daycare, and only after trying to continue to make the arrangement work for six months. Further, the uncontested testimony was that father voluntarily relinquished his Tuesday overnight visits with the children before mother moved to Vergennes, and later voluntarily relinquished Sunday overnight visits. But in any case, as discussed in ¶ 43, infra, even assuming the family court properly concluded that father was somewhat more inclined to foster visitation, this does not change the fact that the family court's critical conclusion regarding the impact of relocation on the children was unsupported by any evidence.
[6] There was, in fact, extensive testimony from the parties as well as a daycare provider regarding the extent and nature of Matt Parrish's positive relationship with the children  but this testimony was given scant attention by the family court. In particular, in January 2004, after father stopped picking up the children from daycare, Matt Parrish took on this responsibility. He moved into the home with mother, the two children, and his own young daughter in March of 2003, and they lived together as a tightly knit family unit from that point forward. Mother married Matt Parrish after her divorce from father was final. There was lengthy testimony to the effect that Matt spent a great deal of time with the children, and that the three children considered each other as siblings.
[7] As described above, with this statement, the family court glossed over extensive testimony about the nature and depth of the children's relationship with Matt Parrish and his daughter. This was error. See Cloutier v. Blowers, 172 Vt. 450, 452, 783 A.2d 961, 963 (2001) (court is required to take into account all evidence relevant to best interests of the child).
[8] See, e.g., Lane, 158 Vt. at 498, 614 A.2d at 791 ("After dissolution of a marriage, a new family unit . . . is created. Allowing the new family to flourish is in itself conducive to the best interests of the children involved.").
[9] See Hawkes v. Spence, 2005 VT 57, ¶ 13, 178 Vt. 161, 878 A.2d 273 (adopting § 2.17(1) of the ALI Principles of the Law of Family Dissolution).