2009 VT 110

## Raymond E. Knutsen v. Karen Cegalis

[989 A.2d 1010]

No. 08-256

Present: **Dooley, Johnson, Skoglund and Burgess, JJ., and Eaton, D.J.,** **Specially Assigned**

Opinion Filed December 10, 2009

100

*Stephen Alan Dardeck* and *Pamela Gatos* of *Tepper Dardeck Levins & Gatos, LLP*, Rutland, for Plaintiff-Appellee.

*Alan P. Biederman* of *Biederman Law Office*, Rutland, and *Kurt M. Hughes* of *Murdoch Hughes & Twarog*, Burlington, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Mother appeals the Rutland Family Court order awarding her primary rights and responsibilities of the parties' minor child until March 1, 2010, at which time the rights

and responsibilities automatically shift to father for the remainder of the child's minority. On appeal, mother contends that the order's provision automatically shifting the rights and responsibilities to father is unlawful and that we are compelled by principles of res judicata to order that she retain primary rights and responsibilities to the child indefinitely. We agree that the provision in question is unlawful, but disagree that mother should be awarded indefinite rights to the child by virtue of res judicata. Consequently, we reverse and remand for the family court to make a new custody order.

¶ 2. The relevant facts may be briefly stated. The parties were never married. They met in 2004, conceived a child, and subsequently moved in together in father's Vermont residence in March 2005. Their child was born on August 16, 2005. The parties lived together on a somewhat steady basis until February 2006 when the relationship dissolved and mother took the child from their Vermont home and moved to New Hampshire.

¶ 3. Thereafter, father filed a complaint for parentage in the Rutland Family Court, which resulted in a temporary order for parental rights and contact. For purposes of the temporary order, the parties agreed that the child would remain with mother in New Hampshire and have contact with father every other weekend and on one weekday per week.

¶ 4. In seeking a final order before the family court, father requested additional contact with the child until the start of kindergarten and primary rights and responsibilities for the child thereafter. Specifically, father testified that he would support mother having custody of the child until the child started kindergarten as long as he could have contact with the child every other week from Wednesday through Sunday with one additional weekday contact on every off-week. Father testified that when the child started kindergarten and he obtained primary custody, he would support contact with the mother as frequently as every weekend and every school vacation. In opposition, mother requested that she be granted permanent primary rights and responsibilities over the child, but with a temporarily expanded contact schedule for father until the child began kindergarten. Mother proposed that contact thereafter be reduced to accommodate the child's school schedule. The parties' proposals overlapped in that they both suggested that mother retain custody until the child started kindergarten and proposed identical contact schedules for father

from January 2009 until the start of kindergarten. The proposals differed, however, regarding the period of time between the date of the final order and January 2009. And, of course, the parties disagreed as to who should be awarded primary rights and responsibilities once the child started kindergarten.

¶ 5. In its final order, the family court awarded primary rights and responsibilities to mother until the start of kindergarten, subject to contact with father every other week from Wednesday through Sunday with one additional weekday contact during every off-week. The court also awarded primary rights and responsibilities to father from a date six months prior to the child's matriculation at kindergarten — March 1, 2010 — through the remainder of the child's minority.[1] In reaching this decision, the court weighed the nine factors for determining the best interests of the child, 15 V.S.A. § 665, and found that, although both parties could provide quality care for the child, ultimately the balance favored an award to father when the child approached school age. Specifically, the court found that the decision turned on father's demonstrated superior ability to promote frequent and continuing contact between the child and the other parent, *id.* § 665(b)(5), and his superior disposition to meet the child's future developmental needs, *id.* § 665(b)(3). The court found that these factors outweighed the mother's status as the child's primary caregiver. See *id.* § 665(b)(6). This appeal followed.

¶ 6. On appeal, mother challenges the order on the grounds that the provision automatically shifting primary rights and responsibilities to father is unlawful — specifically because the automatic switch: (a) is scheduled to happen in the future and is therefore unsupported by findings, based on speculation as to what the circumstances will be at that time, and fails to consider the child's best interests; (b) violates the principles of res judicata because the court is essentially reversing its own judgment without any new facts; and (c) impermissibly circumvents the court's need to establish jurisdiction to modify the order. Mother also argues that the court disregarded the parties' agreement that the child remain with mother until age six — instead awarding custody of the child to father some five months before his fifth

---

[1] The parties dispute whether the child will start kindergarten in the fall of 2010, when he is five years old, or 2011, when he is six. Because of our resolution of the case, we find it unnecessary to resolve this issue.

birthday — and that the court improperly conflated the factors listed in 15 V.S.A. § 665(b)(3) and (5). Finally, mother argues that because father did not cross-appeal that part of the award granting mother custody from the date of the final order until the start of kindergarten, that part of the award is res judicata and cannot be considered on appeal or remand. We agree that the provision automatically shifting rights and responsibilities to father was unlawful, but disagree with mother's res judicata argument and remand for reconsideration of the entire award.

¶ 7. The issue of whether an automatic custody change provision is lawful is a pure question of law which we review de novo. See *Heffernan v. Harbeson*, 2004 VT 98, ¶ 7, 177 Vt. 239, 861 A.2d 1149. We reverse the family court's order because automatic changes in parental rights and responsibilities are contrary to precedent and contravene policies behind the child custody statutes.

■ ■ ¶ 8. We discussed automatic changes of custody in *deBeaumont v. Goodrich*, 162 Vt. 91, 96-97, 644 A.2d 843, 846 (1994). There, we upheld a final custody decree that included a provision naming the occurrence of a particular event as sufficient for establishing the changed circumstances — and thus the jurisdiction — needed to modify the award. *Id.* at 95-96, 644 A.2d at 846; see also 15 V.S.A. § 668 (providing that a court may modify a custody order upon a showing of "real, substantial and unanticipated change of circumstances"). In *deBeaumont*, the mother challenged the provision that the threshold of changed circumstances would be met by a parent moving more than fifty miles away. The father argued that the provision created a reasonable benchmark to determine whether the parties' circumstances had changed significantly enough for the purpose of challenging the existing child custody arrangement. We agreed. *deBeaumont*, 162 Vt. at 95-96, 644 A.2d at 846. In doing so, we distinguished the disputed provision from one that would *automatically* change custody upon the happening of an event. *Id.* at 96-97, 644 A.2d at 846. We reasoned that we would not give effect to a provision automatically changing custody because such an order would be based on " 'speculation [as to] what the best interests of . . . children may be at a future date.' " *Id.* at 97, 644 A.2d at 846 (quoting *Hovater v. Hovater*, 577 So. 2d 461, 463 (Ala. Civ. App. 1990)). Any change of custody, we reasoned, must be based on an independent assessment of the best interests of the children at

the time of the contemplated change. *Id.*; see also *Wells v. Wells*, 150 Vt. 1, 4, 549 A.2d 1039, 1042 (1988) ("Willful interference with court ordered visitations, no matter how deplorable, cannot be made the basis for an automatic change of custody." (quotations omitted)). We see no reason to depart from the course we set in *deBeaumont* today.

¶ 9. At the outset, we note that *deBeaumont* is in line with the law of our sister states. An overwhelming majority of courts that have considered the question take the view that automatic change provisions in custody orders are impermissible.[2] In contrast, we were able to find only two courts that have upheld such provisions under direct attack. See *Maeda v. Maeda*, 794 P.2d 268, 270 (Haw. Ct. App. 1990); *State v. Hart*, 132 P.3d 1249, 1254 (Idaho 2006) (noting that such a "case creates a difficult issue"); see also *Roberts v. Roberts*, 64 P.3d 327, 330 (Idaho 2003).

¶ 10. Moreover, our reasoning in *deBeaumont* — that changes in custody must be based on real-time determinations of a child's best interests — remains persuasive. The variables are simply too unfixed to determine at the time of a final divorce decree what the circumstances of the parties will be at the time a future contingency occurs. Cf. *Scott*, 578 S.E.2d at 880 (citing unfixed and indeterminate variables in determining that automatic change provision unlawful). As a result, the family court cannot resolve prospectively whether an automatic change in custody will

---

[2] Those courts hail from: Alabama: *Cleveland v. Cleveland*, 18 So. 3d 950, 952 (Ala. Civ. App. 2009); *Hovater*, 577 So. 2d at 463; Delaware: *Anderson v. Anderson*, No. 513, 1997, 1998 WL 309848, at *1 (Del. May 28, 1998); Florida: *Pardue v. Pardue*, 518 So. 2d 954, 956-57 (Fla. Dist. Ct. App. 1988); Georgia: *Scott v. Scott*, 578 S.E.2d 876, 879-81 (Ga. 2003); Illinois: *In re Marriage of Seitzinger*, 775 N.E.2d 282, 289 (Ill. App. Ct. 2002); Indiana: *Mundon v. Mundon*, 703 N.E.2d 1130, 1136 (Ind. Ct. App. 1999); Louisiana: *Cook v. Cook*, 920 So. 2d 981, 983 (La. Ct. App. 2006); Minnesota: *Huft v. Huft*, No. C8-02-1986, 2003 WL 21525042, at *2 (Minn. Ct. App. July 8, 2003); Missouri: *Koenig v. Koenig*, 782 S.W.2d 86, 90 (Mo. Ct. App. 1989); *N.K.M. v. L.E.M.*, 606 S.W.2d 179, 183 (Mo. Ct. App. 1980); New York: *Zwack v. Kosier*, 876 N.Y.S.2d 717, 718 (App. Div. 2009); *Posporelis v. Posporelis*, 838 N.Y.S.2d 681, 685 (App. Div. 2007); *Rhubart v. Rhubart*, 789 N.Y.S.2d 385, 385 (App. Div. 2005); North Dakota: *Zeller v. Zeller*, 2002 ND 35, ¶ 18, 640 N.W.2d 53; Ohio: *Herstine v. Herstine*, No. 13873, 1994 WL 37209, at *3 (Ohio Ct. App. Feb. 9, 1994); *Bastian v. Bastian*, 160 N.E.2d 133, 136 (Ohio Ct. App. 1959); Oregon: *In re Marriage of Compton*, 33 P.3d 369, 372-73 (Or. Ct. App. 2001); *In re Marriage of Jacobson*, 735 P.2d 627, 628-29 (Or. Ct. App. 1987); Virginia: *Wilson v. Wilson*, 408 S.E.2d 576, 579 (Va. Ct. App. 1991); and Wyoming: *Martin v. Martin*, 798 P.2d 321, 323 (Wyo. 1990).

be in the best interests of the child at the time of the triggering event. In this case, there is no way of knowing who these parties will be in a few years — particularly the child — or what the nature of their relationships with each other will be at the time the child enters kindergarten. Mother and father could choose to relocate, change careers, enter into romantic relationships, or even have more children. All of these changes would properly contribute to a best interests calculus undertaken at the time the child is school-aged. The advent of school, while certainly a formidable milestone, is only one factor in a long list which must be considered if a change in custody is contemplated at that time. See *Rhubart*, 789 N.Y.S.2d at 386 (vacating automatic change provision premised on future contingency and reasoning that "[n]o one factor is determinative of whether there should be a change in custody" (quotation omitted)). The best interests determination cannot be made in the absence of all the necessary facts. What those facts may be when the child enters kindergarten are matters of speculation. "Such speculation is not a substitute for complete analysis of all existing circumstances when and if a change in [a] . . . child custody arrangement becomes necessary." *Martin*, 798 P.2d at 323. By reference to the factors outlined in § 665, a family court must decide what custody arrangement serves the best interests of a child given the circumstances that exist *at that time*. See 15 V.S.A. § 665(b). After that, the family court's role is extinguished unless and until presented with the changed circumstances needed to support its jurisdiction to modify the award. See *id.* § 668 (providing that a court may modify a custody order if it is in the best interests of a child "upon a showing of real, substantial and unanticipated change of circumstances").

■ ¶ 11. Father urges us to distinguish this case from *deBeaumont* on the grounds that, unlike in *deBeaumont* where neither the fact nor the timing of the condition's occurrence was certain, in this case, the child's matriculation at kindergarten is an anticipated event that occurs on a date certain. Setting aside the fact that the parties actually dispute the date on which the child will begin kindergarten, see *supra*, ¶ 5 n.1, the distinction father asks us to make is without a difference, and makes no difference to a child. See *Herstine*, 1994 WL 37209, at *3 (reasoning that the difference between automatic change provisions involving definite versus indefinite dates "is not critical" and that both are unlawful).

■ ¶ 12. As we have previously made clear, a custody change is a significant and confusing change for a child. *Lane v. Schenck*, 158 Vt. 489, 499, 614 A.2d 786, 792 (1992). When we shift rights and responsibilities between parents, every aspect of a child's life is subject to change — including everything from how much television the child watches to what school the child attends. See *Cabot v. Cabot*, 166 Vt. 485, 494, 697 A.2d 644, 650 (1997). Thus, this Court and others have recognized that stability in custody arrangements is desirable due to the potential harm that inures to children as a result of shuttling them between their parents. See, e.g., *Wells*, 150 Vt. at 5 n.*, 549 A.2d at 1042 n.*; *Hayes v. Hayes*, 144 Vt. 332, 336, 476 A.2d 135, 138 (1984); see also *Rice v. Rice*, 415 A.2d 1378, 1383 (D.C. 1980); *Jordan v. Jordan*, 439 A.2d 26, 29 (Md. Ct. Spec. App. 1982), *overruled in part as recognized by Braun v. Headley*, 750 A.2d 624, 629 (Md. Ct. Spec. App. 2000). Automatic change provisions like the one at issue in this case build instability into a child's life, and this is so whether the automatic change is premised on an anticipated or unanticipated event.

■ ■ ¶ 13. A blanket rejection of automatic custody change provisions is also consistent with the policy against forcing shared custody onto parents who are at war with each other. The Legislature has provided that "[w]hen the parents cannot agree to divide or share parental rights and responsibilities, the court shall award parental rights and responsibilities primarily or solely to one parent." 15 V.S.A. § 665(a). We have recognized that a court risks placing a child in the middle of constant disputes by forcing unwilling parents to share parental rights and make joint deci-sions. *Cabot*, 166 Vt. at 494, 697 A.2d at 650. The evil the Legislature sought to avoid by preventing courts from ordering parents to share rights and responsibilities in the absence of agreement was the negative effect the resulting animosity has on children. *Id.* The automatic change provision at issue in this case is no less harmful in that it subjects any child-rearing decision made by mother to veto by father starting on March 1, 2010. In our judgment, the provision breeds increased opportunity for animosity between the parents of the kind § 665 seeks to avoid, not to mention confusion for the child.

■ ¶ 14. Again, the weight of authority supports our view. Courts that reject automatic custody change provisions do so

regardless of whether the event that triggers the change is certain to occur. To be sure, the annals are replete with decisions criticizing automatic change provisions premised on unanticipated or speculative events; however, courts also strike down these provisions when premised on events that will occur on a date certain, including at the child's attainment of a certain age, *Cleveland*, 18 So. 3d at 952 (one year old); *Jacobson*, 735 P.2d at 628-29 (twelve years old), after the passage of a certain period of time, *Herstine*, 1994 WL 37209, at *3 (one year from the dissolution of marriage), and — importantly, for our case — at the commencement of a certain school year, *Compton*, 33 P.3d at 372-73 (high school). Thus, we are also in agreement with our sister states in holding that the distinction between anticipated and unanticipated events that trigger an automatic custody change provision is one that should not impact our analysis. See *Jacobson*, 735 P.2d at 628-29 ("[Courts] lack the power to order an automatic change of custody operative solely on the occurrence of a birthday, the end of a school year or any other such happening. Further, we doubt that a court could ever provide for an automatic change of custody on the happening of any general or specific event."). In fact, we are unable to find a single jurisdiction that distinguishes between the two kinds of triggering events. Rather, whatever a jurisdiction's rule regarding automatic change provisions, that rule is applied uniformly regardless of whether the contingency triggering the automatic change is certain to occur or speculative. Compare *Cleveland*, 18 So. 3d at 952 (voiding provision divesting mother of custody on child's first birthday), with *Hovater*, 577 So. 2d at 463 (holding that custodial reversionary clause providing that custody be transferred from mother to father if mother moves from school district to be of no effect); compare *Herstine*, 1994 WL 37209, at *3 (holding that court may not give effect to provision in parties' separation agreement automatically transferring custody from one parent to the other on the first anniversary of the dissolution of marriage), with *Bastian*, 160 N.E.2d at 136 (declining to give effect to clause in parties' separation agreement granting father custody until mother "obtained adequate and proper living quarters and [was] able to properly care for" the child, whereupon mother would have custody); compare *Hart*, 132 P.3d at 1254 (holding that it was no abuse of discretion to order that equal joint physical custody change to primary physical custody with father once child started school), with *Roberts*, 64

P.3d at 330 (upholding provision transferring custody to father upon mother's relocation out of county).

¶ 15. We also wish to clarify that it makes no difference whether the court's award of primary rights and responsibilities to mother, and then to father, was apparently premised on father's concession to the arrangement.[3] Even if it were fair to say that an "agreement" flowed from father's concession, any such agreement would not circumvent the court's duty to act in the best interests of the child. *Luce v. Cushing*, 2004 VT 117, ¶ 10, 177 Vt. 600, 868 A.2d 672 (mem.). Despite the Legislature's determination that an agreement between the parties on the issue of parental rights and responsibilities is presumptively in the best interests of children, see 15 V.S.A. § 666(a) ("Any agreement between the parents which divides or shares parental rights and responsibilities shall be presumed to be in the best interests of the child."), a court is not bound by that agreement when the evidence demonstrates that the best interests of a child requires a different result. *Luce*, 2004 VT 117, ¶ 10; see also 15 V.S.A. § 666(c) ("If the court finds that an agreement between the parents is not in the best interests of the child . . . the court shall refuse to approve the agreement."). Because, as we have established, automatic changes concerning who has primary rights and responsibilities are not in the best interests of children, it matters little to what extent the trial court relied on father's concession in crafting its order in this case. See *Hovater*, 577 So. 2d at 463 (ruling that custodial reversionary clause was of no effect despite parties' agreement to it); *Scott*, 578 S.E.2d at 879 n.3 ("No relevant distinction may be drawn between self-executing change of custody provisions based upon their source."); *Mundon*, 703 N.E.2d at 1136 (holding that an automatic change provision is void whether agreed to by the parties or not); *Zwack*, 876 N.Y.S.2d at 718 (holding that a court may not give effect to a provision in the parties' separation agreement automatically changing custody upon the occurrence of a certain event; rather, the court was obligated to make a best interests determination at the time of the proposed change); *Herstine*, 1994 WL 37209, at *3 (same); *Jacobson*, 735 P.2d at 629 (reasoning that the parties' agreement to the disputed provision did not confer upon the court that which

---

[3] The trial court's decision lacks any specific explanation as to why mother was granted parental rights and responsibilities given its analysis under § 665.

it lacked — "power to provide for an automatic change of custody").

¶ 16. Finally, we need only briefly discuss mother's contention that because father failed to cross-appeal that portion of the custody award granting mother primary rights and responsibilities until March 1, 2010, the award is res judicata and that that portion of the custody award may not be revisited on appeal or on remand. The natural extension of this argument is that we should affirm the award and remand with directions to reconsider parental rights and responsibilities thereafter. Mother's argument is without merit. The doctrine of res judicata "bars litigation of a claim or defense if there exists a final judgment *in former litigation* in which the parties, subject matter, and causes of action are identical or substantially identical." *Kellner v. Kellner*, 2004 VT 1, ¶ 8, 176 Vt. 571, 844 A.2d 743 (mem.) (emphasis added) (quotation omitted). Stated more generally, the doctrine precludes relitigation *in a second suit* of what was or could have been litigated in a suit in which there has been a final judgment. The doctrine is thus on its face an ill fit for mother's contention. This is because, of course, neither proceedings on appeal nor remand constitute a second suit for purposes of res judicata. The family court made a comprehensive ruling in which the temporary award of custody to mother was premised on the eventual, indefinite award to father. Thus, there is also no basis in logic for prohibiting the family court from reevaluating the entire custody award on remand. In fact, in order to safeguard the best interests of the child, the family court must be given the latitude to make another comprehensive order, consistent with law. Cf. *Cleveland*, 18 So. 3d at 952 (rather than simply voiding an automatic change provision, remanding with instructions to vacate the provision and determine the custody arrangement "that currently serves the best interests of the [child]," where it was not clear from the record what the child's best interests were).

¶ 17. We find it unnecessary to reach the remainder of the parties' arguments in light of our decision. We reverse the family court's order, but continue the custody and parental contact provision as specified in the final order until such time as that court can revisit its decision. On remand, the family court shall reevaluate the custody order in its entirety in light of the opinions expressed herein.

*Reversed and remanded.*

¶ 18. **Dooley, J.,** dissenting. The majority's holding in this case sends two unfortunate messages to litigants and family courts in future parental rights proceedings. First, a parent who attempts to cooperate in a custody transition may lose his or her custody rights *because of the cooperation,* and therefore parents must contest custody at every stage of the proceeding to preserve their rights. Second, the trial court's discretion to determine the best interests of the child is limited to decisions involving the immediate short-term needs of the child and cannot include changes to respond to future anticipated needs, and therefore courts should expect more litigation of parental rights and parent-child contact as children grow. I think this decision will be a major impediment to needed flexibility in fashioning child custody and visitation awards, and we will regret that we imposed these limitations.

¶ 19. In this case, father elected not to contest mother's request to retain primary rights and responsibilities until their child is old enough to attend kindergarten. Instead, he proposed an alternative that would give him liberal contact in the short term and primary rights and responsibilities in the long term. The trial court concluded that father's proposal was in the best interests of the child, but the majority now rejects the order as unlawful. Not only does the majority's rejection of the court's decision penalize father for his effort to be amicable and cooperative, it also removes the trial court's broad discretion in the area of child custody. Because I believe the trial court acted within its discretion in fashioning a parental rights and responsibilities order that was in the best interests of the child, I dissent.

¶ 20. I begin with the substance of the court's order. The family court concluded that it was in the child's best interests to have a meaningful relationship with both parents and accomplished this by awarding mother parental rights with liberal contact for father and then granting father parental rights once the child begins school. The court based its decision on extensive findings, including an analysis of the statutory best interest factors. 15 V.S.A. § 665. The court found that the parties' child is well adjusted and has an excellent relationship with both of his parents. On most factors, the court found that the parents were equally able to parent and nurture their son. The court found, however, that two factors in particular favored father. On the parties' relative abilities to meet the child's present and future developmental needs, the court found that "[t]he one significant factor which

favors [father] on this issue is [mother's] evident predisposition to limit [father's] role in [the child's] life." The court noted that mother was the child's primary caregiver, but found this was outweighed by father's superior ability "to foster a positive relationship and frequent and continuing contact with the other parent." 15 V.S.A. § 665(b)(5). The court found that it was important for the child to have ongoing contact with both parents and concluded that father could better ensure that the child maintains a relationship with both parents.

¶ 21. While the majority briefly recounts the facts, I believe it is important to underscore that the trial court's findings are supported by extensive evidence. Beginning even before the child was born, mother sought to limit father's parental rights to his son. The court found that mother refused to have father's name put on the birth certificate. In addition, mother left the state on three occasions, once when she was eight months pregnant, once in September 2005, and finally in February 2006 when she left permanently. The trial court found that mother desired to negate father's parental rights by moving the child out of Vermont. When mother left for the final time on February 9, 2006, she did not tell father where she was going or that she was leaving with their child. The court found that mother's actions were "calculated to minimize [father's] ability to have meaningful and comfortable contact with his son." Even after father filed for parentage, mother continued to be uncooperative in allowing father to see his son. Mother at first refused to acknowledge father's paternity, but eventually mother stipulated that father was the child's biological father. The parties agreed on a temporary order for parental rights and contact, which granted mother primary parental rights and responsibilities and gave father contact every other weekend, starting at 7:00 p.m. on Friday evening. The agreement also allowed father to have a weekday visit from 3:00 to 7:00 p.m. When father sought to have the weekday visit on Fridays to allow him to pick up his son at a more reasonable hour and arrive home in time to have dinner and go to bed, mother refused.[4]

---

[4] Mother argues that in denying father's request she was simply abiding by the exact terms of the temporary order and that her refusal to deviate from the agreement should not be held against her. While I agree with mother that she was not obligated to grant father's request, I also conclude that mother's refusal to cooperate was relevant to the trial court's determination of whether mother is able

¶ 22. In reaching its decision, the court also had the benefit of a forensic evaluation completed prior to the final hearing. The evaluator recommended that mother have primary legal and physical responsibilities until the start of kindergarten, with gradually increased contact for father as the child grows. The evaluator did not make a recommendation as to what should happen after the child starts kindergarten.

¶ 23. At trial, father testified that he was in general agreement with the evaluator's recommendation and did not contest mother continuing parental rights in the short-term as long as he was granted contact with the child from Wednesday evening through Sunday evening every other week, and primary rights and responsibilities once the child starts kindergarten. Father proposed that mother could have contact every weekend. Father explained that his work schedule would allow him to be home in the morning before school, take the child to school and to pick him up at the end of the day. In answer to why he was not contesting mother initially continuing parental rights, father stated:

> this is a tough thing, this is not easy, and I want as little hard feelings to come out of this hearing as possible, so if I need to give a little bit now to, to help maintain the peace, I think, I think that should be done. I want us to get along.

¶ 24. Mother testified that she agreed with the evaluator's recommendation to gradually increase father's time with son. Mother opposed father's proposal to transfer custody once the child begins school because she felt it would involve too much travel time for the child to visit her every weekend. Mother, however, did not object to father's request based on an assertion that such an order would violate the law. In fact, mother requested that the court look forward and incorporate how parental rights and parent-child contact should change as the child gets older and starts school.

¶ 25. Given these facts, the court concluded that it was in the child's best interests to design a transitional parental rights order. The court found that once the child starts kindergarten the current contact schedule would be impractical because the parties live too far apart to shuttle the child to and from the same school.

---

to foster a positive relationship and frequent contact with father. See 15 V.S.A. § 665(b)(5).

Recognizing that this event will require diminishing parent-child contact for the noncustodial parent, the court concluded that it was in the child's best interests for father to have primary physical and legal responsibility and for mother to have liberal parent-child contact. The main reason for this was mother's demonstrated inability to foster a positive relationship with father. As explained above, the court recognized mother's status as primary caregiver, but found that the other factors weighed more heavily in father's favor. See *Habecker v. Giard*, 2003 VT 18, ¶ 14, 175 Vt. 489, 820 A.2d 215 (mem.) (affirming trial court's finding that the father's ability to put children's needs ahead of his own and to foster positive relationship with the mother outweighed the mother's status as primary care provider). Because the court considered all of the statutory factors and its findings are supported by credible evidence, I would affirm. Instead, the majority concludes that the transfer is an automatic change provision that is unlawful and adopts a rule which rejects any future transfer of custody because this will be, as a matter of law, "not in the best interests of children." *Ante*, ¶ 15.

¶ 26. First and foremost, this is a classic application of the adage: "let no good deed go unpunished." As the family court reported, "Mother argues that changing custody before [the child] starts kindergarten would be a 'violent dislocation' that is not in [the child's] best interest." Father responded to mother's "violent dislocation" argument by proposing a compromise that left the child in the mother's primary custody until the child started kindergarten. While the court was not necessarily bound by father's concession, it properly honored it as a voluntary settlement offer. See *Harris v. Harris*, 149 Vt. 410, 420, 546 A.2d 208, 215 (1988) ("We have a strong policy in favor of voluntary settlement of contested custody matters."). Thereafter, mother did not object on the basis she now asserts — that it is beyond the court's discretion to order a future transfer as a matter of law. See *Sundstrom v. Sundstrom*, 2004 VT 106, ¶ 21, 177 Vt. 577, 865 A.2d 358 (mem.) ("[T]o preserve an issue for appeal, a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." (quotation omitted)). Not only did mother not claim such a compromise was unlawful, she essentially sought the compromise by objecting strenuously to any custody change before the child entered school. Had she objected to the transfer on the point now raised on

appeal, father would have had the opportunity to devise an alternative schedule and the court could have considered the parties' proposals with her objection in mind.

¶ 27. The majority ignores mother's lack of preservation and the invited error, and blindsides father for proposing the compromise in the first instance. As I have observed before, it is in the child's worst interests to be subjected to continuous litigation over custody, which is the real result here. *Cloutier v. Blowers*, 172 Vt. 450, 457-58, 783 A.2d 961, 967 (2001) (Dooley, J., dissenting). We are inflicting an injustice on the child under the guise of protecting the child's best interests, and ignoring preservation requirements to do so. At the same time, we are encouraging parents to fight and never compromise.

¶ 28. Putting aside the unique circumstances of this case that make the majority's application of a new rule inappropriate, I also believe that for general reasons the majority's bright-line rule should not be adopted. The majority argues that the disputed provision delaying the transfer of custody is unlawful because it is "contrary to precedent and contravene[s] policies behind the child custody statutes." *Ante*, ¶ 7. I have looked at our precedents and the "policies behind the child custody statutes," *id.*, and find no requirement for such a bright-line rule. Indeed, I believe that the new rule is inconsistent with the policies behind the child custody statutes and our precedent for four specific reasons. The most important of these reasons, as discussed below, is the fourth, but I have put it last because the others reasons are important and would alone cause me to reject the majority decision.

¶ 29. First, we must acknowledge that our primary rule has been to give trial courts broad discretion in fashioning parental rights and responsibilities orders. The majority's blanket prohibition detrimentally removes necessary discretion from the family court, and is contrary to our cases that have unequivocally afforded the family court broad discretion in assigning parental rights and responsibilities. See *Rogers v. Parrish*, 2007 VT 35, ¶ 26, 181 Vt. 485, 923 A.2d 607; *Kasper v. Kasper*, 2007 VT 2, ¶ 5, 181 Vt. 562, 917 A.2d 463 (mem.). We generally affirm the court's findings in child custody matters unless they are clearly erroneous, and "[w]here the family court's award of custody reflects its reasoned judgment in light of the record evidence, its decision [is not] disturbed." *Kasper*, 2007 VT 2, ¶ 5. Thus, in this case, while a court cannot make a future determination of a child's best

interests, a court certainly can use its common sense to determine that once a child starts school the child's schedule will change and consequently liberal parent-child contact must also change. See *id.* ¶ 6 (explaining that family court can use its common sense and life experience in delineating parental rights).

¶ 30. Second, we must recognize that we have previously upheld orders that change parent-child contact at a future date or when a child enters school with no hint that such an order is illegal. See *Heffernan v. Harbeson*, 2004 VT 98, ¶ 13, 177 Vt. 239, 861 A.2d 1149 (affirming parent-child contact schedule that changes once child begins school); *Nickerson v. Nickerson*, 158 Vt. 85, 87, 605 A.2d 1331, 1332 (1992) (outlining parent-child contact schedule that changes once younger child turns two and again when child reaches school age); see also *Trim v. Brunton*, No. 2005-027, 2005 WL 6151846, at *1 (Vt. Oct. 28, 2005) (unpub. mem.), available at http://www.vermontjudiciary.org/d-upeo/eo05-027.F.aspx (affirming custody order maintaining the existing contact schedule of alternating weeks with mother until the child entered kindergarten, when visitation would change to every other weekend). Indeed, my sense from reviewing family court divorce and parentage orders is that such provisions are routine. The majority's rationale appears to apply equally to parental rights and responsibility orders as well as parent-child contact orders. Thus, I assume these routine parent-child contact orders are now illegal, and our earlier cases allowing them are now overruled. Rather than being commanded by precedent, the majority's new rule overturns precedent.

¶ 31. Third, in general, we have allowed creative custody orders even though their elements are not specifically authorized by statute. For example, in *Kasper*, this Court held that the trial court had discretion to award physical responsibilities to the father and legal rights and responsibilities to the mother. 2007 VT 2, ¶ 7; see also *Solsaa v. Solsaa*, 2008 VT 138, ¶ 8, 185 Vt. 587, 969 A.2d 116 (mem.). In addition, this Court has concluded that the family court has discretion to award responsibility for decisions in some areas to father and for other areas to mother. See *Shea v. Metcalf*, 167 Vt. 494, 498, 712 A.2d 887, 889 (1998) (affirming division of discrete legal rights and responsibilities between mother and father). Moreover, we have worked out practical approaches to be sure that changes of circumstances and their consequences are properly evaluated in determining parental rights and responsibilities. See *Gazo v. Gazo*, 166 Vt. 434, 441-42,

697 A.2d 342, 346 (1997) (explaining that mother must choose and either tell the trial court she plans to move so that the court can factor this into the custody decision as an anticipated event, or tell the court that she will not move so that any move will be unanticipated for the purposes of modification). We have limited the trial court's discretion in crafting parental rights orders only in cases where the Legislature has clearly indicated by statute that the court's power is limited. See *Cabot v. Cabot*, 166 Vt. 485, 493, 697 A.2d 644, 649 (1997) (concluding that the family court exceeded its authority by ordering joint legal parental rights and responsibilities where 15 V.S.A. § 665(a) specifically precluded such an arrangement in the absence of agreement by the parties).

¶ 32. Fourth, the application of the majority's restrictive rule is inconsistent with our settled law on modification of custody orders. That law, which allows modification only upon a showing of an unanticipated change of circumstances, prevents the majority's announced purpose of its rule — to prevent speculation on a child's future needs — from being fulfilled. As the majority states, "[t]he variables are simply too unfixed to determine at the time of a final divorce decree what the circumstances of the parties will be at the time a future contingency occurs." *Ante*, ¶ 10. It goes on to reason that "[a]s a result, the family court cannot resolve prospectively whether an automatic change in custody will be in the best interests of the child at the time of the triggering event." *Id.* That rationale would make sense if the court could reevaluate custody at the time of the triggering event, in this case the child's entry into school, but it is inapplicable, and seriously misguided, if the court cannot make that reevaluation. Our custody modification law prevents that reevaluation.

¶ 33. The governing statute provides that a court may modify a custody order "upon a showing of real, substantial and unanticipated change of circumstances." 15 V.S.A. § 668. Most relevant to this appeal is the requirement that the change be "unanticipated." A change is unanticipated if it was "not expected at the time of divorce." *Hoover v. Hoover*, 171 Vt. 256, 258 n.2, 764 A.2d 1192, 1193 n.2 (2000); see also *Sundstrom*, 2004 VT 106, ¶ 35 (following *Hoover*). For example, if at the time of a divorce, the parties contemplated that the custodial parent would move from Washington County, Vermont to Albany, New York, such a move cannot subsequently be a change of circumstances to trigger a custody modification because it was not unanticipated. *Dunning v. Meany*, 161 Vt. 287, 290, 640 A.2d 3, 5 (1993).

¶ 34. In this case, the child's attendance at school is anticipated; indeed, it is virtually certain. As we noted in *Pigeon v. Pigeon*, "a child's maturation from dependent infant to increasingly autonomous and active school-aged child, rather than being unanticipated, is a welcome and expected fact of life." 173 Vt. 464, 466, 782 A.2d 1236, 1238 (2001) (mem.). Therefore, it cannot be the grounds for a modification of custody when it occurs. Mother raises exactly this limitation in this case. She argues that the start of school is an anticipated life event and therefore not a requisite unanticipated change of circumstances that would meet the threshold requirement for changing custody.

¶ 35. Thus, the majority's reason for imposing its rigid rule is a fiction. Whatever custody determination is reached on remand, it will commence before the child attends school and continue after the child attends school without change. Directly contrary to the majority's rationale, it will be based on a prediction of "what the circumstances of the parties will be at the time a future contingency [starting school] occurs." *Ante*, ¶ 10. In effect, the trial court will by default be making exactly the prediction the majority bars the trial court from making. Assuming the family court sees the circumstances the same way after remand, the difference between the order that has been reversed and the new order is that the new one will not be in the child's best interests, either in the short run before the child enters school, or in the long run thereafter.

¶ 36. Putting aside the policy reasons why I believe that the majority's decision is wrong, I also disagree with the majority's argument that its rule is compelled by our case law, specifically the decision in *deBeaumont v. Goodrich*, 162 Vt. 91, 644 A.2d 843 (1994), the primary precedent relied upon by the majority. In *deBeaumont*, the final order granted mother sole parental rights and responsibilities and father parent-child contact three days each week. The order also contained a provision mandating that if either party moved more than fifty miles from his or her current home the move would be a change of circumstances and would give the court jurisdiction to reconsider parental rights. Thereafter, mother moved out of state and sought sole parental rights and responsibilities. We held that the provision was effective to demonstrate changed circumstances because it was based on a stipulation of the parties and it established a reasonable benchmark to determine changed circumstances. *Id.* at 96, 644 A.2d at

846. We cautioned, however, that we would not give effect to a provision "that would automatically change custody because of a relocation by the physical custodian" because it would rest on mere speculation of the future best interests of the children. *Id.* at 97, 644 A.2d at 846. We distinguished the facts in *deBeaumont* because that order dealt only with the threshold finding of a change of circumstances and still required an assessment of the child's best interests by the court. *Id.*

¶ 37. I disagree that this case involves the kind of automatic change provision *deBeaumont* referenced. This transfer is not an open-ended clause allowing an automatic transfer upon an indefinite event, such as the custodial parent's relocation. Instead, the transfer is to occur at a date certain because of a known and anticipated change in the child's life. Moreover, the order is premised on the undisputed fact that once the child starts school the child will necessarily not be able to split time between the parents in the manner the parties are currently doing. Although the trial court found that this change would affect the child, there could be no reexamination of custody at that time because the triggering event is anticipated. This is in contrast to *deBeaumont* where the event was unanticipated and could trigger a change of circumstances sufficient to warrant modification.

¶ 38. Similarly, I do not believe this case is governed by the long list of cases from other states that the majority cites for the proposition that "automatic change provisions in custody orders are impermissible." *Ante,* ¶ 9. Most of the cases cited are relocation cases, like *deBeaumont*, in which the trial court mandates that if the custodial parent moves out of a certain area, then custody will automatically transfer to the other parent. See, e.g., *Hovater v. Hovater*, 577 So. 2d 461, 463 (Ala. Civ. App. 1990) (giving no effect to clause that would automatically divest parent of physical custody if she moved out of school district); *Emerick v. Emerick*, 502 A.2d 933, 938 (Conn. App. Ct. 1985); *In re Marriage of Seitzinger*, 775 N.E.2d 282, 289 (Ill. App. Ct. 2002) (invalidating provisions in final order automatically changing primary physical custodian upon parent's move from certain counties). Others automatically change custody upon other nonspecific events, such as the custodial parent's change of living situation, association with a particular person or choice to pursue a certain career. See, e.g., *Pardue v. Pardue*, 518 So. 2d 954, 956-57 (Fla. Dist. Ct. App. 1988) (invalidating provision automatically revoking

custody in wife if she pursues a musical career); *Cook v. Cook*, 920 So. 2d 981, 983 (La. Ct. App. 2006) (vacating order that would automatically change custody of minor children to father if mother associated with a certain person); *Huft v. Huft*, No. C8-02-1986, 2003 WL 21525042, at *2 (Minn. Ct. App. July 8, 2003) (reversing order that allowed father to obtain joint custody if he completed certain requirements).

¶ 39. The concern of these cases is that it is pure speculation to surmise how future unknown events will alter a child's situation and, therefore, it is impossible to know what a child's future best interests will be. See *Hovater*, 577 So. 2d at 463. I share this general concern about reversionary clauses such as those cited above, but conclude that the order in this case is simply not such an automatic change provision.

¶ 40. I acknowledge that there are also a few cases wherein courts have nullified provisions that involve a transfer on a given date or when the child reaches a certain age, but the ability to modify a custody order in the future may be different in these jurisdictions.[5] I am not persuaded that these cases present any cogent reasoning for adopting the bright-line rule advanced by the majority. Generally, these cases seem to regurgitate the generally adopted rule that provisions automatically changing custody on the occurrence of an event are invalid. See, e.g., *Cleveland v. Cleveland*, 18 So. 3d 950, 952 (Ala. Civ. App. 2009) (eliminating clause in divorce judgment that automatically transformed mother's physical custody of daughter into joint physical custody at daughter's first birthday); *Herstine v. Herstine*, No. 13873, 1994 WL 37209, at *3 (Ohio Ct. App. Feb. 9, 1994) (invalidating

---

[5] As explained, our law sets a high bar for modification of custody, requiring a threshold showing of a "real, substantial and unanticipated change of circumstances." 15 V.S.A. § 668. The threshold requirement for modification in other jurisdictions is not as stringent. For example, in Alabama, modification does not depend on demonstrating that the change was unanticipated. Instead, "the party seeking to modify a prior custody decree bears the burden of proving that the change in custody materially promotes the welfare and best interest of the child in a manner sufficient to more than offset the effects caused by the uprooting of the child from his present custodian." *Reuter v. Neese*, 586 So. 2d 232, 234 (Ala. Civ. App. 1991) (quotation omitted). In addition, in Ohio, the passage of a substantial period of time such as from "infancy to early adolescence" is a sufficient change to warrant inquiry into whether the best interests of the child would be served by a change in custody. *Perz v. Perz*, 619 N.E.2d 1094, 1096-97 (Ohio Ct. App. 1993).

provision that transferred custody from father to mother after one year from entry of order); *In re Marriage of Jacobson*, 735 P.2d 627, 628-29 (Or. Ct. App. 1987) ("[A] dissolution court would lack the power to order an automatic change of custody operative solely on the occurrence of a birthday, the end of a school year or any other such happening. Further, we doubt that a court could ever provide for an automatic change of custody on the happening of any general or specific event."); *In re Marriage of Compton*, 33 P.3d 369, 373 (Or. Ct. App. 2001) (nullifying provision allowing child to express preference for residence once child reaches high school). Moreover, while there may have been sound reasons for a court in a particular situation to reject a transfer clause, see *Jacobson*, 735 P.2d at 628 (invalidating provision to change custody to father when child reaches age twelve, more than ten years after the judgment), I conclude that the trial court is in a better position to determine this on an individualized basis, see *id.* at 631-32 (Rossman, J., dissenting) (concluding that trial courts should have discretion to determine if a future change in custody from one parent to another is in the child's best interests).

¶ 41. The necessity of an individualized assessment is illustrated here. The family court judge struggled with the conflicting pressures of meeting the child's needs in the short and long terms in fashioning its order. The court balanced the hardship caused to the child by transferring custody to father "versus the strong potential for stability from age six to eighteen." The court arrived at its decision after considering the child's best interests both now and in the future. The majority argues that future transfers of custody always build instability and disruption into a child's life. In this case, however, the trial court found exactly the opposite, and the finding is supported by the evidence. The court found that the child has a good relationship with both parents and adjusts well to transitions between his parents' households. In addition, the court fashioned a gradual transition schedule to minimize instability.

¶ 42. I disagree with the majority's criticism of this gradual transition schedule. The majority asserts that the parental rights and responsibility order is prohibited by 15 V.S.A. § 665(a) because it requires parents to cooperate during the transitional period. The majority further contends that requiring such cooperation is akin to a situation in which parents are forced to share parental rights, which is not allowed under the statute. I fail to understand

how this situation is the same. The problem with forced sharing is that no one parent is in charge and "by forcing unwilling parents to share parental rights and make joint decisions, a court risks placing a child in the middle of constant and harmful disputes." *Cabot*, 166 Vt. at 494, 697 A.2d at 650. There is no forced sharing in this case. Under the court's order, there is always a primary parent. In addition, although there is a transitional period, which requires consultation, it is not contrary to the statute or policy to require parents to consult and cooperate with one another. See *id.* at 495, 697 A.2d at 650-51 (court may require primary parent to consult with noncustodial parent); see also 15 V.S.A. § 665(d) (court may order custodial parent to inform other parent of major changes). Thus, I disagree with the majority that § 665 and the policy expressed therein prohibit the trial court from designating an award of future custody.

¶ 43. I have commented in the past on the tendency of this Court to pay lip service to a discretionary standard of review in contested custody cases, but to actually engage in de novo review. See *Cloutier*, 172 Vt. at 456-57, 783 A.2d at 966. This case should be viewed as another example of that trend as this Court limits family court discretion in the name of an inappropriate and rigid rule of law. It should come as no surprise that in doing so the majority ignored normal preservation rules and punished the party who made a voluntary concession to reduce the acrimony between the parents. Rather than rendering all such orders unenforceable, this Court should encourage the foresight displayed by the trial court in this case. When a court can respond to anticipated life changes and build corresponding changes in parental rights and parent-child contact into final orders, then these changes will not require court intervention and parents will not be required to continually go to court to alter schedules that are no longer practical for a child's lifestyle.

¶ 44. Whether we would have reached the same result as the family court is not the point. *Kasper*, 2007 VT 2, ¶ 7 ("Whether the family court had other effective options is not the focus of our inquiry."). The trial court has broad discretion in custody cases, and the court should have discretion to do what it did here in order to protect the best interests of the child. The abuse of discretion lies with us for not staying within our limited role. I believe that the court acted within its discretion in this case, and would affirm on that basis.