2011 VT 38

## Kimberlee J. Herring, v. Lee K. Herring, Jr.

[24 A.3d 574]

No. 10-017

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 5, 2011

*Kimberlee Herring*, Pro Se, Brattleboro, Plaintiff-Appellee.

*Lee K. Herring, Jr.*, Pro Se, Springfield, Defendant-Appellant.

¶ 1. **Dooley, J.** Husband Lee Herring, pro se, appeals from the family court's denial of his motion to terminate spousal maintenance to wife Kimberlee Herring. Serving a post-divorce prison sentence for sexual assaults against his daughter, husband no longer has a source of income. The family court held that his incarceration was not an "unanticipated change of circumstances" justifying modification under 15 V.S.A. § 758 because incarceration was a foreseeable consequence of his crimes. For the reasons set forth below, we reverse.

¶ 2. The couple divorced on April 8, 2008. The divorce decree required husband to pay $1000 per month to wife as permanent spousal maintenance, to end when either party dies or reaches the age of sixty-five. The divorce decree was affirmed by this Court. See *Herring v. Herring*, No. 2008-204, 2009 WL 2410254 (Vt. March 5, 2009) (unpub. mem.), available at http://www.vermontjudiciary.org/d-upeo/upeo.aspx (holding that trial court did not err in assessment of parties' income, or in refusing to continue proceedings until criminal charges were resolved).

¶ 3. In December 2008, eight months after the order of divorce and maintenance was entered, husband was found guilty of sexual assault and lewd or lascivious conduct for numerous acts involving his daughter when she was between the ages of six and sixteen. Husband's sexual abuse of the couple's daughter was a major factor in their divorce. The State's first prosecution of husband ended in a hung jury, which occurred before the divorce was granted. After the second trial, in June 2009, husband was sentenced to serve an aggregate of thirty-five years to life in jail. Upon conviction, he was immediately incarcerated. Husband ap-

pealed his convictions and sentences, and his criminal case was reversed and remanded for a new trial.[1]

¶ 4. Husband paid maintenance pursuant to the divorce order for the first six months following the divorce, but he stopped making payments after October 2008. Arrearages on the permanent maintenance, as well as on an earlier award of temporary maintenance, were paid out of funds escrowed from the sale of the parties' marital home. No money remains from this sale, and husband has no other assets or source of income.

¶ 5. Wife filed a motion to enforce spousal maintenance some three months after husband's incarceration. Husband responded with a motion to modify. Denying the motion to modify, the family court granted wife's motion to enforce maintenance. This appeal by husband followed on the question of whether the family court erred in holding that husband's incarceration was not an unanticipated change in circumstances warranting modification of the maintenance award.

¶ 6. Under 15 V.S.A. § 758, a court may modify a spousal maintenance award only "upon a showing of a real, substantial, and unanticipated change of circumstances." An unanticipated change in circumstances is "a jurisdictional prerequisite" for modification of spousal maintenance, and "the burden is on the moving party to establish the requisite change." *Golden v. Cooper-Ellis*, 2007 VT 15, ¶ 57, 181 Vt. 359, 924 A.2d 19. The threshold determination of changed circumstances is discretionary, and no fixed standards exist for determining what meets the threshold. *Taylor v. Taylor*, 175 Vt. 32, 36, 819 A.2d 684, 688 (2003). Rather, "evaluation of whether or not any given change is substantial must be determined in the context of the surrounding circumstances." *Id.* (quotation omitted). We accord that determination considerable deference on review. See *Braun v. Greenblatt*, 2007 VT 53, ¶ 11, 182 Vt. 29, 927 A.2d 782 (discussing standard of review for determinations of substantial change of circumstances). "Thus, we will not disturb the court's determination unless its exercise of discretion was on grounds or for reasons clearly untenable, or the exercise of discretion was to a clearly unreasonable extent." *Meyer*

---

[1] Husband's criminal conviction was reversed and remanded after the current case was heard for oral argument. See *State v. Herring*, 2010 VT 106, 189 Vt. 211, 19 A.3d 81. Husband has been released on conditions of bail pending a retrial. Our recitation of the facts above does not reflect these later events.

*v. Meyer*, 173 Vt. 195, 197, 789 A.2d 921, 923 (2001). Despite the deference we give the trial court, we cannot uphold its decision in this case because it misapplied the standard for determining whether a change of circumstances is unanticipated.

¶ 7. The family court reasoned that husband's incarceration was not an unanticipated change because the divorce decree took his alleged criminal activity into account, referencing the fact that husband faced the prospect of retrial for his criminal charges, and because the underlying conduct that led to incarceration was "voluntary, willful, and had a devastating impact on the family." We cannot conclude that the pendency of the criminal proceeding or the nature and impact of husband's crimes made his incarceration, and resulting loss of income, anticipated. Though incarceration may have been a foreseeable consequence of husband's alleged crimes, husband was unable to rely upon his future possible incarceration to avoid payment of maintenance when the original order was created. This is the rule from *DeKoeyer v. DeKoeyer*: "irrelevant was defendant's speculation regarding his future economic condition; only his condition contemporaneous with the hearing and his condition at the time of the divorce were relevant." 146 Vt. 493, 495-96, 507 A.2d 962, 962-64 (1986). At the time of the divorce, husband was criminally charged with sexually assaulting his daughter, and his first trial had ended in a mistrial. It was pure speculation whether husband would be convicted after a second trial and what his sentence would be if convicted. Although the criminal prosecution and future retrial were known at the time of the divorce hearing, the hearing proceeded on the basis that husband was working and producing income and would continue to do so. There was no consideration of how the result of the criminal trial might affect husband's income-producing capacity and for how long. It would have been impossible to consider this without speculation and an attempt at a contingent order with numerous unpredictable contingencies. Thus, the divorce order makes no mention of his possible incarceration in setting the maintenance order even though the family court was clearly aware of the circumstances.

■ ■ ¶ 8. Because husband's incarceration was not taken into account in deciding the original maintenance order, we hold that the incarceration was "unanticipated" for purposes of 15 V.S.A. § 758. The term "unanticipated" in § 758 must be interpreted by reviewing the facts and circumstances underlying the divorce

order and determining whether incarceration, or another condition causing a reduction in income, was taken into account in establishing the original maintenance order. If it was, then the incarceration or other condition was anticipated. If it was not, then the incarceration or other condition was unanticipated. We outlined this rule in *Shaw v. Shaw*, 162 Vt. 338, 340-41, 648 A.2d 836, 838 (1994). In that case, the husband sought termination of his maintenance obligation because he lost his job, and his wife answered that the job loss was caused by the husband's criminal conduct in connection with his work, conduct for which he was being investigated at the time of the divorce. While we affirmed a decision of the family court to reduce but not terminate the husband's obligation, we rejected the argument that the husband's job loss was anticipated. *Id.* at 340-41, 648 A.2d at 838-39. In *Shaw*, we specifically noted that the husband's termination had not been considered in negotiating the original maintenance award, and we disagreed with the wife's claim that the husband's termination was anticipated because the husband was under investigation a year before the divorce for alleged criminal activities. *Id.* at 340, 648 A.2d at 838. We concluded that if the husband's termination was not fully taken into account by the original divorce, then it could not later be found to have been "anticipated." *Id.* at 340-41, 648 A.2d at 838. As in *Shaw*, husband's incarceration here was not fully contemplated by the original maintenance award. At the time that maintenance order was written, husband's criminal case had not yet concluded, and his conviction and incarceration were still uncertain.

¶ 9. Cases from other state courts have similarly allowed for the subsequent consideration of "unanticipated" circumstances if the "unanticipated" change was not fully taken into account by the court deciding the original divorce order. In coming to a conclusion in *Shaw* on the issue of whether the husband's termination was anticipated, this Court referenced two out-of-state cases which allowed circumstances that were speculative at the time of divorce to be considered later for modification purposes: *Chaney v. Chaney*, 699 P.2d 398, 401-02 (Ariz. Ct. App. 1985) (holding that though future retirement was contemplated when decree issued, date was speculative and did not bar later modification), and *Lambertz v. Lambertz*, 375 N.W.2d 645, 646 (S.D. 1985) (per curiam) (noting that although trial court was aware that husband might retire after decree issued, evidence was speculative and did

not bar modification based on substantial reduction in income). *Shaw*, 162 Vt. at 340, 648 A.2d at 838. Oregon's interpretation of its modification statute, Or. Rev. Stat. § 107.135, is consistent with this rule. In *In re Marriage of Wilson*, for example, a husband argued that he had not retired at the time of the dissolution of his marriage, so his retirement eight months afterwards was not an anticipated change. 63 P.3d 1244, 1249 (Or. Ct. App. 2003). The court stated that "even if husband's retirement was foreseeable when the parties' marriage was dissolved, the timing of its occurrence was speculative and, thus, it could not have affected his support obligations at that time. It follows that husband's post-dissolution early retirement constituted an unanticipated change of circumstances . . . ." *Id.* Like the retirement situations in *Marriage of Wilson, Lambertz,* and *Chaney,* the possibility in this case that husband would be incarcerated was still speculative and was not considered in initially determining spousal maintenance. Incarceration should therefore have been considered an "unanticipated" change for purposes of modifying maintenance.

¶ 10. Although it did not say this explicitly, the family court decision suggested that husband's loss of income should not be considered for the purpose of the motion to modify maintenance because it was caused by voluntary criminal conduct. We recognize that an obligor spouse's "[v]oluntary termination of employment without good reason" generally disqualifies the spouse from support modification. *Shaw*, 162 Vt. at 340, 648 A.2d at 838. Here, however, the incarceration was involuntary although the conduct that resulted in the incarceration may have been voluntary. Again, the key precedent is *Shaw.* There, we specifically stated that wrongdoing that results in diminished income may fall within the category of voluntary termination of employment and bar modification of maintenance based on changed circumstances. *Id.* At the same time, however, we held that in a situation where a job was lost due to wrongdoing that occurred *before* a divorce, the loss of employment was not voluntary. *Id.* Because the husband's firing in *Shaw* "was triggered by events that had occurred eight years earlier," we concluded that the facts "would not support a conclusion that his loss of employment was voluntary." *Id.* In the present case, as in *Shaw*, husband's wrongdoing occurred significantly prior to the divorce. As discussed in that case, any speculation that husband might lose his job as a result of the wrongdoing was not taken into account at the time of divorce in

determining the maintenance award. Here, as in *Shaw*, husband took no voluntary action subsequent to the creation of his support obligation that jeopardized his employment or his ability to pay maintenance. Husband's incarceration and his resulting loss of income cannot be considered voluntary in terms of his maintenance obligation because these circumstances were entirely due to events that occurred before the divorce.

¶ 11. We recognize that there are public policy reasons to impose a continuing spousal support obligation, based on his or her former income, on an obligor who is incarcerated for commission of a crime. Implementation of these policy reasons should be done by the Legislature, rather than by this Court, through an appropriate statutory amendment that will precisely define when the obligation to pay spousal maintenance should continue despite the termination of the obligor's source of income to pay the maintenance.

*Reversed and remanded for further proceedings consistent with this order.*

¶ 12. **Reiber, C.J.**, dissenting. I would uphold the family court's determination that husband's incarceration due to his voluntary criminal acts against the parties' daughter should not be considered an unanticipated change of circumstances relieving him of his maintenance obligation.[2] Both our law and public policy considerations compel me to conclude that an obligor may not avoid a support obligation as the result of criminal acts that lead to the obligor's incarceration — particularly where, as the family court found, husband's acts were the pivotal causal factor in the parties' divorce and ensuing support obligation. Accordingly, I respectfully dissent.

¶ 13. Many, if not a majority of, jurisdictions have adopted the "no justification" rule precluding the elimination or reduction of support obligations based on the obligor's incarceration. See *Staffon v. Staffon*, 587 S.E.2d 630, 631, 632 n.7 (Ga. 2003) (holding that "obligor's imprisonment for voluntary criminal acts is not grounds for a downward modification of child support obligations" based on changed circumstances, and noting that "[a]t least seventeen jurisdictions that have considered this issue adhere to

---

[2] This Court reversed husband's conviction and denied the State's motion for reargument; thus, husband's future incarceration is once again uncertain.

this approach"); *Yerkes v. Yerkes*, 824 A.2d 1169, 1172 n.3, 1173 (Pa. 2003) (adopting "no justification" rule and noting that "[a]t least fifteen jurisdictions appear to adhere to this approach"), *superseded by rule as stated in Plunkard v. McConnell*, 2008 PA Super 282, ¶ 9, 962 A.2d 1227; see, e.g., *Knights v. Knights*, 522 N.E.2d 1045, 1046 (N.Y. 1988) (mem.) (concluding that trial court did not abuse its discretion in determining that father's incarceration and ensuing financial hardship were not changed circumstances warranting reduction or suspension of child support payments); *Ohler v. Ohler*, 369 N.W.2d 615, 618 (Neb. 1985) (stating that incarceration "is certainly a foreseeable result of criminal activity" and that child support obligor may not be relieved of payments "by virtue of the fact that he or she engaged in criminal conduct"), *superseded by statute as stated in Hopkins v. Stauffer*, 775 N.W.2d 462, 466 (Neb. Ct. App. 2009).

¶ 14. Most of these cases concern child support obligors, but because neither child support nor maintenance obligations are punitive in nature and both are aimed at "meeting the reasonable needs of the obligee," there is no reason to apply the "no justification" rule to child support but not maintenance. *Willoughby v. Willoughby*, 2004 PA Super 439, ¶¶ 1, 15-16, 862 A.2d 654 ("We hold that an obligor's incarceration due to criminal activity does not alone represent a 'change of circumstances' to justify complete relief from the obligor's spousal support obligations."). Indeed, the public policy principles concerning equity and fairness, discussed below, that favor applying the "no justification" rule in child support cases also favor applying the rule to maintenance obligations. *Id.* ¶ 17.

¶ 15. Courts adopting the "no justification" rule have reasoned that it would be unfair to obligees to suspend support obligations as the result of the obligors' voluntary criminal activities that could foreseeably lead to incarceration and loss of income. See, e.g., *Staffon*, 587 S.E.2d at 633; *Yerkes*, 824 A.2d at 1176-77. I agree that it would be anomalous to offer criminals a reprieve from their support obligations "when we would not do the same for an obligor who voluntarily walks away from his job." *Yerkes*, 824 A.2d at 1176 (quotation omitted). Moreover, by waiving support payments for incarcerated obligors, we would effectively subordinate those payments to other financial obligations that under the law are not affected by the incarceration of the obligor. See *id.* at 1175 ("[W]e simply cannot justify relieving incarcerated

parents of their child support obligations when they are not relieved of their other financial obligations."); see also *Staffon*, 587 S.E.2d at 633 ("When people are incarcerated, they are not relieved of their other financial responsibilities, such as the making of restitution, car or mortgage payments, and the duty to support a child should be afforded at least the same legal status as these obligations").

¶ 16. In situations involving incarcerated obligors, we have two choices — we could suspend their support obligations and thereby eliminate any chance of the obligees obtaining the support that they were granted or we could refuse to suspend the obligations and allow the payments to go into arrears if necessary. In either situation, an obligee most likely would receive no support during the obligor's incarceration, but at least the obligee would have some hope of being reimbursed in the future for arrears in situations where the support obligation had not been suspended. *Yerkes*, 824 A.2d at 1174 (noting that "the 'no justification' rule at least provides for the possibility that the obligor will repay the support" obligation). Indeed, in this case, the trial court noted in support of its findings that at some point husband might begin to receive a future stream of income from Social Security or pension benefits that could allow him to make payments toward any support arrearage. For all of these reasons, we should not consider incarceration to be an unanticipated changed circumstance sufficient to relieve an obligor of support payments.

¶ 17. This approach is supported by our law. The governing statute provides that a court may modify a maintenance order "upon a showing of a real, substantial, and unanticipated change of circumstances." 15 V.S.A. § 758. "A change is unanticipated if it was not expected at the time of divorce." *Knutsen v. Cegalis*, 2009 VT 110, ¶ 33, 187 Vt. 99, 989 A.2d 1010 (quotation omitted) (referring to identical clause in child custody and support modification statute). Here, if husband committed the charged criminal acts against his daughter, his divorce, incarceration, and loss of income stemming from those acts could certainly be expected.

¶ 18. In support of its holding, the majority relies primarily on retirement and loss-of-job cases. According to the majority, because the divorce courts in those cases did not take into account the potential financial repercussions of the obligor's possible retirement or job loss, the retirement or job loss had to be considered "unanticipated." But, for the reasons stated above, the

situation is qualitatively different when an obligor's voluntary criminal activity led to the loss of income. When the obligor's voluntary criminal acts result in incarceration and loss of income, we should not, as a matter of public policy, compel the trial court to weigh the financial repercussions of the incarceration before the incarceration can be considered anticipated. In essence, in such situations, we should hold that public policy considerations preclude a finding that the incarceration is unanticipated.

¶ 19. The principal case upon which the majority relies, *Shaw v. Shaw*, is entirely consistent with my position. 162 Vt. 338, 648 A.2d 836 (1994). In *Shaw*, the family court refused to modify the obligor's maintenance obligation after he was terminated from his job, at least in part, for job-related wrongdoing that had occurred years before the divorce. We expressly acknowledged that "[w]rongdoing that results in diminished income may fall within the category of voluntary termination of employment and bar modification of maintenance on grounds of changed circumstances," but agreed with the husband that "the wrongdoing in this case would not support a conclusion that his loss of employment was voluntary." *Id.* at 340, 648 A.2d at 838. In so ruling, we noted that (1) "[t]here was no evidence that, at the time of the divorce, either party had any reason to believe husband would lose his job because of his prior actions"; and (2) the testimony at the divorce hearing did not suggest that the parties' settlement agreement had been affected in any way by the possibility of a later job loss. *Id.*

¶ 20. In contrast, here, in issuing the divorce decree, the family court specifically noted the "pivotal causal connection" between husband's molestation of his daughter and the parties' divorce. Moreover, there can be no doubt husband was aware that his acts against his daughter, if revealed, would likely lead to the parties' divorce, a maintenance obligation, and incarceration. The obligor in *Shaw* could not have anticipated that his unauthorized purchase of a truck from a company vendor would lead, years later, to either his loss of employment or his divorce. The same cannot be said of husband's actions here.

¶ 21. In short, the facts in *Shaw* are different from the facts in this case, but the rationale underlying *Shaw* supports affirming the trial court's decision here. In the event that husband is ultimately convicted and incarcerated for sexually assaulting the parties' daughter over the course of several years, he should not

be relieved of the very obligation that resulted from such heinous acts. Cf. *Waskin v. Waskin*, 484 So. 2d 1277, 1278-79 (Fla. Dist. Ct. App. 1986) (concluding that modification of alimony was not warranted where husband's reduced finances resulted from expense in defending against criminal charges alleging that he hired someone to murder his wife, as cited in *Shaw*).